312 Ga. 565
FINAL COPY

S21A0712.  OVERSTREET v. THE STATE.

BETHEL, Justice.

A Ben Hill County jury found Dabrentise Overstreet[1] guilty of malice murder and other offenses in connection with the shooting death of Craigory Burch, Jr., the aggravated assault and armed robbery of Burch's girlfriend, Jasmine Hendricks, and the aggravated assault of their son, C. B., a minor. On appeal, Overstreet argues that the evidence presented at trial was insufficient to support his convictions for malice murder and violations of the Georgia Street Gang Terrorism and Prevention Act (the "Gang Act"), that the trial court abused its discretion by admitting certain evidence of a prior conviction and guilty plea, and that his trial counsel provided ineffective assistance by failing to

---

[1] Although the appellant's name appears as "Dabrentis Overstreet" on the style of the Notice of Appeal, this appears to be a misspelling, as the body of the Notice of Appeal, the indictment, and Overstreet's brief refer to him as "Dabrentise Overstreet."

move for a change of venue. We affirm.[2]

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. On November 30,

---

[2] The crimes occurred on January 20, 2016. On April 4, 2016, a Ben Hill County grand jury indicted Overstreet, Nathaniel Baker, Wayan Malik Jordan, Anjevell Vail Johnson, Keyana Dyous, Earnest Holcomb, and Rosalyn Renise Swain on the following counts: malice murder of Burch (Count 1), felony murder of Burch predicated on aggravated assault (Count 2), aggravated assault of Burch (Count 3), home invasion (Count 4), two violations of the Gang Act predicated on home invasion and armed robbery (Counts 5 and 8), armed robbery of Burch (Count 6), armed robbery of Hendricks (Count 7), aggravated assault of Hendricks (Count 9), and aggravated assault of C. B. (Count 10). Overstreet was also indicted with Baker and Jordan on four counts of possession of a firearm during the commission of a felony (Counts 11 to 14), and Baker was indicted for possession of a firearm by a convicted felon (Count 15). The other co-defendants either pled guilty and testified against Overstreet or were tried separately from Overstreet. This Court previously affirmed Baker's and Jordan's convictions arising from this incident. See *Baker v. State*, 312 Ga. ___ (___ SE2d ___) (2021); *Jordan v. State*, 307 Ga. 450 (836 SE2d 86) (2019). None of the co-defendants' cases are part of this appeal.

At a jury trial held from June 26 to 30, 2017, Overstreet was found guilty of Counts 1 through 14. On July 13, 2017, the trial court sentenced Overstreet to life in prison without the possibility of parole on Count 1; a consecutive sentence of life in prison on Count 4; concurrent sentences of life in prison on Counts 6 and 7; concurrent terms of 20 years in prison each on Counts 5, 8, 9, and 10; and terms of ten years in prison each on Counts 11, 12, and 14, to run consecutively to Count 4 and to each other. Count 2 was vacated by operation of law, and Count 3 merged with Count 1. At the State's request, the trial court merged Count 13 with Count 12.

Overstreet filed a motion for new trial on July 28, 2017, which he amended through new counsel on January 8, 2019. Following a hearing on November 12, 2019, the trial court denied Overstreet's motion, as amended, in an order dated January 15, 2020. Overstreet filed a notice of appeal on February 12, 2020. His case was docketed to this Court's April 2021 term and submitted for a decision on the briefs.

2015, Burch won over $400,000 playing the lottery. At the time, Burch lived with his girlfriend, Hendricks, and their children in Fitzgerald. After winning the lottery, Burch bought Christmas presents for neighborhood children and gave them out at a nearby gymnasium. Burch and Hendricks bought a new house on Stubbs Avenue, and the family moved there in early January 2016. Burch also bought a new Dodge Durango.

On the afternoon of January 20, 2016, Overstreet was at Katherine Tillman's house with Rosalyn Swain, Anjevell Johnson, Earnest Holcomb, and Wayan Jordan. Overstreet complained that he did not have any money, and Johnson suggested that they rob Burch. Overstreet then called Nathaniel Baker and asked him to bring Overstreet a gun. Overstreet "called around" seeking another gun but was unable to find one. Overstreet also asked Jordan to join him.

Around 9:00 that evening, Keyana Dyous and Baker drove from Moultrie to Fitzgerald in Dyous's silver Honda Accord. Baker was carrying an Intratec 9mm pistol (sometimes referred to as a

"TEC-9") that he had retrieved from the trunk of Dyous's car.[3] Dyous and Baker picked up Johnson, who had left Tillman's house earlier in the evening. They all drove to Tillman's house to attend a "G-Shine" gang meeting. When they arrived, Overstreet came out to the car, opened the trunk, removed a gun, and said "Hell yeah, boy, that's a TEC-9."

G-Shine is a subset of the "East Coast Bloods" street gang, and Baker, Johnson, Overstreet, Jordan, and Holcomb were all members of G-Shine. They each had nicknames, which Dyous told the police were their "Blood names." Other members of the gang included Adonis Sharp, also known as "Knowledge," who was considered a "Big Homie." According to Dyous, Sharp was "at the top" of the gang and "over" other members, including Baker, Jordan, Overstreet, Johnson, and Holcomb.

The State presented the testimony of an expert in criminal street gangs and criminal gang activity. The expert testified that a

---

[3] Dyous described the gun as a black "AK" that was approximately two-and-a-half feet long.

"Big Homie" is someone in the "upper echelon of the gang." He elaborated that each gang has a different organizational structure and regulations but that the hierarchy is often similar to that used by the military or law enforcement agencies. The expert stated that a low-level "soldier" would carry out orders given by those above him in the command structure and that doing so would help a "soldier" rise in the organization. The expert testified that G-Shine is one of a number of gangs referred to as "shooters" and a "cleanup crew" who "put in work," meaning that they enforce organizational rules, make money for the gang, and murder or harm others for the gang. The expert described G-Shine as among the most violent factions of the East Coast Bloods. He testified that if, for example, a local chapter of G-Shine was not "performing up to standards" by "putting in enough work," gang members from nearby towns might be called in to assist them.

The expert reviewed several social media posts made by Overstreet, Johnson, Holcomb, and Jordan and testified that they included photographs of members giving gang hand signs and

wearing red, the color most prominently associated with the East Coast Bloods and G-Shine. A number of the posts also included common lingo associated with the East Coast Bloods gang. Photographs posted to Overstreet's social media account showed that he had numerous gang-related tattoos. He was also known to go by the nickname "Peter Roll Shine." That nickname indicated that he was a member of G-Shine and that he had either committed a murder or that he "can do it."

The expert testified that a rival gang, the Gangster Disciples, often displayed the colors black and blue. The expert testified that if the Gangster Disciples had established business for themselves in a particular area, there was a likelihood of violence if members of the two gangs confronted each other. The State presented evidence that Overstreet and Johnson had been involved in an incident in Sylvester with some members of the Gangster Disciples in which Overstreet and Johnson were injured and Johnson's girlfriend's car was damaged by gunfire.

Several members of the G-Shine gang lived in the

neighborhood in Fitzgerald where Burch and Hendricks lived before Burch won the lottery. The State presented evidence that Overstreet, Johnson, and Jordan did not appreciate that Burch had bought gifts for the children in the neighborhood and stated that they wanted to rob Burch because he was "flexing" and "showing off" by handing out the gifts.

After the G-Shine meeting, which ended sometime before 11:00 p.m., Dyous and Swain drove various gang members, including Overstreet, to the house of a man known as "Perp." Overstreet, Baker, Holcomb, and Jordan got out of the car and spoke to Perp, who gave them directions to a gambling house where Burch was supposed to be. After spending about five minutes at Perp's house, Overstreet, Johnson, Jordan, and Baker got into Dyous' car. They put on ski masks and covered their faces with white t-shirts. Dyous testified that Baker's gun was in her front seat at this time. Holcomb got into Swain's car, and Overstreet instructed Swain to wait on a side street. The group in Dyous's car drove around for approximately 20 to 25 minutes, but they were unable to locate the gambling house.

Overstreet, Jordan, and Baker got out of the car near a local convenience store, and Dyous and Johnson drove to a nearby McDonald's. Johnson told Dyous that he did not get out of the car with the others because he did not have a gun.

Overstreet, who was 5 feet 11 inches tall and weighed 200 pounds, was wearing a black jacket. Jordan, who was 6 feet 6 inches tall and weighed 154 pounds, wore a green jacket. Baker, who was 5 feet 9 inches tall and weighed 130 pounds, wore a brown jacket.

Burch and Hendricks were at their new home with their children. While watching television, Hendricks heard a gunshot, and three men forcibly entered the home. Once inside the home, two of the men stayed in the living room while the third went into the kitchen. All three men had face coverings, and each had a gun. The "buff," "stocky and short" man had a long, black gun, approximately two-and-a-half to three feet long, and he repeatedly asked, "Where the money at?" One of the three intruders, who was tall and "skinny," held Hendricks at gunpoint and took three cell phones and her wallet, which contained about $200. Burch was holding C. B.

while sitting on the couch, and the "buff" man was pointing a gun at them. After the intruders asked Burch for money, he attempted to give the "buff" man his jeans. The man then shot Burch in the knee twice. Burch yelled, "Don't do this in front of my kids."

The men left the home approximately two to three minutes later. Burch was still alive at this time and was still holding C. B. However, after the men left the home, Hendricks and Burch saw that someone had turned on the lights of their Dodge Durango, which was parked in the driveway. The "buff" man then came back inside the home, shot Burch five more times in the thighs and chest, then left with the other two men. C. B. was sitting on the couch and began to cry. After the men left, Hendricks looked outside and saw the "buff" man standing near a stop sign and speaking on a phone. Hendricks then saw a silver Honda with tinted windows ride past the house.

Hendricks went outside with C. B. and one of her other children and asked a neighbor for help.[4] Hendricks called 911 from her

---

[4] The third child was still asleep in a bedroom inside the house.

neighbor's phone, and then the neighbor drove Hendricks and the children to a nearby convenience store and waited for the police to arrive.

Two other neighbors, Jan Bagley and Wayne Shavers, stated that they heard gunshots during the time of the incident. After hearing two sets of gunshots, Bagley walked outside and noticed that the Durango's taillights were on. Wayne Shavers saw three men running outside after he heard the gunshots. He described one of the men as around 6 feet 3 inches tall, and the other two as around 5 feet 9 inches tall. Shavers also stated that he saw one of the three men run from the Durango. Two of the men were wearing dark clothing. Shavers later identified the other man, who was wearing a green hooded sweatshirt as he fled from Burch's house, as Jordan.

Law enforcement officers responded to a 911 call and came to the house on Stubbs Avenue around midnight. When they arrived, Burch did not have a pulse. During their investigation of the crime scene, officers found multiple fingerprints, some of which were later matched to Baker. The police recovered one 9mm bullet and four

9mm shell casings from the living room where Burch was shot and several 9mm bullet fragments and seven 9mm shell casings from the home's kitchen and the hallway between the kitchen and living room. All of the shell casings collected from the crime scene were consistent with having been fired from a single Intratec 9mm pistol.

The medical examiner testified that Burch was shot seven times, each from the front, and he died as the result of those gunshots. The manner of death was homicide.

Dyous testified that a few minutes after she dropped off Overstreet, Jordan, and Baker, Baker called her and told her to come back and pick them up. As Dyous drove back to the location at which she dropped them off, she saw Overstreet, Jordan, and Baker walking down the road. Baker got in her car while Overstreet and Jordan continued on foot. Baker then told Dyous to drive around the block. Dyous drove by Burch and Hendricks's house, and Dyous saw Hendricks on the porch saying "help." Dyous stopped the car, but Baker hit her and began "cussing and just having a fit." Dyous then drove herself, Johnson, and Baker back to Tillman's house.

11

After the shooting, Overstreet called Swain and told her to pick up him and Jordan. Overstreet came to the car carrying Baker's TEC-9, and he and Jordan got in the car. Swain, Holcomb, Overstreet, and Jordan then drove back to Tillman's house.

At Tillman's house, Overstreet was still holding the TEC-9. Overstreet later came outside and put the gun in the trunk of Dyous's car. Inside, Overstreet bragged about shooting Burch in the chest and legs and said that he would kill anyone who "said anything." He also made fun of Jordan for not knowing how to start the Durango. Those inside also mocked Johnson and Holcomb for being "scared" and staying in the cars with Dyous and Swain. Dyous testified that she saw Overstreet with a wallet, red bank cards, and a phone inside Tillman's home. Swain also saw two cell phones, a woman's wallet, and $200 in cash, and she overheard the men talking about getting money with a debit card they had stolen. Overstreet and Johnson then went outside and broke the cell phones.

After the meeting at Tillman's house broke up, Dyous drove

Overstreet, Baker, and Johnson back to Moultrie via Tifton. As they drove, one of the men threw the cell phone that Dyous had seen out the window. The group stopped to buy gas in Tifton, which Baker paid for in cash. Overstreet told everyone in the car that he had killed Burch and had intended to kill Hendricks, but that the gun he was carrying had jammed. Baker told the group inside the car that he kicked in the door to Burch's house and that Overstreet shot Burch. Baker also said that he planned to hide the guns used in the shooting with another member of the gang. A public works employee later recovered a debit card belonging to Burch from a drainage ditch along the side of a road in south Tifton.

The group arrived in Moultrie around 1:00 a.m., and they stayed at a hotel called the Town Terrace.[5] Either Baker or Johnson paid for the room in cash. Dyous testified that Overstreet was gone

---

[5] The police obtained cell-site location data showing that Dyous's phone had traveled from Moultrie to Fitzgerald (through Tifton) and back to Moultrie (again through Tifton) on the night of the crimes. The data also show that Overstreet's cell phone moved from Fitzgerald to Tifton to Moultrie in the hours after the shooting. A cell phone associated with Burch also traveled from Fitzgerald to an area near Tifton in the early morning hours of January 21.

when she woke up the next morning. Swain picked up Overstreet from the hotel in Moultrie that morning. On the way back to Fitzgerald, Overstreet said he "rolled the guy" and "let him hold nine," meaning he had shot Burch nine times. Swain and Overstreet then discussed a plan to fabricate alibis for themselves and to blame the shooting on someone else.

Overstreet was later arrested on unrelated charges. While in custody and after receiving *Miranda*[6] warnings, he was interviewed by the police on February 15 and March 16, 2016. In the first interview, Overstreet claimed that he was in Tifton at the time Burch was killed, but he admitted being a member of G-Shine. Overstreet also admitted that he had been involved in a different shooting in Sylvester involving the Gangster Disciples and a shooting at a club in Fitzgerald. At trial, the State introduced documents showing that Overstreet pled guilty to aggravated assault, aggravated battery, unlawful possession of a firearm, and

---

[6] See *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

14

violations of the Gang Act based on the shooting at the club.[7]

At trial, the State also presented recordings of Overstreet speaking with Swain on two calls he placed from the jail on March 16 after his police interview that day. In those calls, Overstreet told Swain that people were "talking," that the police would want to interview her, and that she should not say anything. Overstreet later wrote a letter to Swain after she made a court appearance. In the letter, Overstreet said Swain had done some "dumb a** crazy a** sh** that you know damn well you shouldn't have did." The letter also stated that Swain had done things she would "regret." Swain considered the letter to be threatening her for speaking with a detective.

(a) Overstreet first contends that the evidence presented at trial was insufficient as a matter of constitutional due process to support his conviction for malice murder. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

A person commits the offense of murder when he

---

[7] In his second interview, Overstreet continued to insist that he had been in Tifton at the time of the home invasion and shooting of Burch.

15

unlawfully and with malice aforethought, either express or implied, causes the death of another human being. The State, of course, must prove malice beyond a reasonable doubt to convict someone of malice murder, as malice incorporates the intent to kill. Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof, while malice is implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart. The malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing. It is for a jury to determine from all the facts and circumstances whether a killing is intentional and malicious.

(Citations and punctuation omitted.) *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019); see also OCGA § 16-5-1 (a).

Overstreet argues that his conviction largely rested upon the testimony of Dyous and Swain, whom he characterizes as the State's key witnesses against him. Overstreet argues that Dyous and Swain provided inconsistent and contradictory testimony at trial and contends that they both admitted that they repeatedly lied to investigators. He also contends that their testimony was further undermined by statements made by other co-defendants about their involvement in the crimes and a lack of forensic evidence from the

crime scene tying Overstreet to the shooting. Overstreet also suggests that both witnesses expected leniency in their own cases in exchange for their testimony against Overstreet.

However, we have long held that "[i]t is the jury's role to resolve conflicts in the evidence and determine the credibility of witnesses." (Citations and punctuation omitted.) *Smith v. State*, 280 Ga. 161, 162 (1) (625 SE2d 766) (2006). Specifically, questions about the reliability of a witness's testimony are "matters within the province of the jury to consider and decide." *McKelvey v. State*, 311 Ga. 34, 39 (2) (855 SE2d 598) (2021). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citations and punctuation omitted.) *Harris v. State*, 304 Ga. 276, 278 (1) (818 SE2d 530) (2018).

Viewed in that light, the evidence showed that on the day of the shooting, Overstreet complained that he had no money, and Jordan suggested that they rob Burch, who had recently won the

17

lottery. The evidence further showed that Overstreet, Jordan, and Baker went to Burch's home armed with several guns. The evidence authorized the jury to determine that after breaking into Burch's house, Jordan held Hendricks at gunpoint while Baker began searching the house. The evidence, including Overstreet's statements bragging about the shooting to others involved in the crimes, also authorized the jury to determine that Overstreet then shot Burch several times after demanding money from him. Thus, the evidence presented at trial was sufficient to sustain Overstreet's malice murder conviction. See *McKelvey*, 311 Ga. at 39 (2) (affirming malice murder conviction where evidence, including the defendant's own statements, identified defendant as shooter and established a motive for the shooting); see also *Jordan v. State*, 307 Ga. 450, 452 (1) (836 SE2d 86) (2019) (affirming malice murder conviction of Overstreet's co-defendant Jordan based on evidence that Overstreet shot and killed Burch and that Jordan shared Overstreet's criminal intent to commit the crime).

(b) Overstreet next argues that the evidence presented at trial

was insufficient to support his convictions under the Gang Act. We disagree.

Overstreet was convicted of two counts of violating the Gang Act by participating in criminal gang activity through the commission of home invasion and an armed robbery as a member of the G-Shine criminal street gang. See OCGA §§ 16-15-4 (a) ("It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."); 16-15-3 (1) (J) (enumerated offenses include any criminal offense that involves violence or the use of a weapon). To convict Overstreet, the State had to prove beyond a reasonable doubt that Overstreet was associated with G-Shine, that G-Shine was a "criminal street gang" within the meaning of the Gang Act, that Overstreet committed the predicate acts of home invasion and armed robbery, and that the commission of those offenses was intended to further the interests of the G-Shine gang. See *McGruder v. State*, 303 Ga. 588, 591-592 (II) (814 SE2d

293) (2018); *Jones v. State*, 292 Ga. 656, 659 (1) (b) (740 SE2d 590) (2013). The State presented sufficient evidence of each of these elements at trial.

At trial, the State presented evidence, including Overstreet's own statements, that Overstreet was a member of G-Shine, which is a subset of the Bloods. The evidence also established that Overstreet and other individuals identified as members of the gang, including Baker, Jordan, Johnson, and Holcomb, each had nicknames that one witness described as their "Blood names." There was also extensive expert testimony and other evidence regarding the Bloods' organizational structure. The State's gang expert testified that G-Shine is one of a number of gangs referred to as "shooters" and a "cleanup crew" who "put in work," meaning that they enforce organizational rules, make money for the gang, and murder or harm others for the Bloods gang. The expert described G-Shine as among the most violent factions of the East Coast Bloods. Through the expert, the State also introduced social media posts made by Overstreet and other G-Shine members that featured gang lingo and

photographs of members, including Overstreet, displaying gang-related tattoos, giving gang hand signs, and wearing red, the color most prominently associated with the East Coast Bloods and G-Shine. Testimony also established that Overstreet was known to go by the nickname "Peter Roll Shine," which indicated that he was a member of G-Shine and that he had either committed a murder or that he "can do it." This evidence authorized the jury to find the existence of the G-Shine gang as a subset of the Bloods and that Overstreet was a member. See OCGA § 16-15-3 (3) (providing that the existence of a gang "may be established by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics" and defining a "criminal street gang" as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity").

Regarding the third element, the evidence presented at trial authorized the jury to determine that Overstreet committed both predicate offenses for the Gang Act violations with which he was

charged. From the evidence presented at trial, the jury was authorized to determine that Overstreet committed the offenses of home invasion (as defined in OCGA § 16-7-5) and armed robbery (as defined in OCGA § 16-8-41 (a)). See *Rodriguez v. State*, 284 Ga. 803, 810 (4) (671 SE2d 497) (2009) ("To support a conviction, the accused must be shown to have conducted or participated in criminal street gang activity through the commission of an actual criminal act." (citation and punctuation omitted)).

To satisfy the fourth and final element of the violations of the Gang Act, the State had to prove that "the commission of the predicate act[s] was intended to further the interests of the (gang)." (Citation and punctuation omitted.) *Stripling v. State*, 304 Ga. 131, 134 (816 SE2d 663) (2018). To do so, the State had to show "some nexus between the act[s] and an intent to further street gang activity." (Punctuation omitted.) *Rodriguez*, 284 Ga. at 807 (1). In cases under the Gang Act, as with other criminal cases, "[c]riminal intent is a question for the jury and may be inferred from conduct before, during[,] and after the commission of the crime." (Citation

22

and punctuation omitted.) *Boyd v. State*, 306 Ga. 204, 210-211 (1) (b) (830 SE2d 160) (2019).

Here, the evidence authorized the jury to determine that Overstreet committed the home invasion and armed robbery in furtherance of the G-Shine gang. Both offenses were planned and executed with other members of G-Shine following a meeting of gang members earlier in the evening. Overstreet and the other gang members then regrouped at the site of the meeting after the incident at Burch's house with the proceeds from the robbery. While there, Overstreet said that he would kill anyone who "said anything." See *Boyd*, 306 Ga. at 211-212 (1) (b) (noting that evidence that gang members "worked together" to commit the predicate offenses and avoid getting caught helped to satisfy the fourth element).

There was also evidence that, prior to that night, several G-Shine members were upset by Burch's act of giving Christmas gifts to children after he won the lottery and that they wanted to rob Burch because he was "flexing" and "showing off" by handing out the gifts. This evidence, along with Overstreet's statements about

23

wanting to rob someone because he needed money, could be interpreted as establishing merely personal, as opposed to gang-related, motives for the home invasion and armed robbery. However, that issue was for the jury to resolve, and the evidence here authorized the jury to infer that the home invasion and armed robbery were committed to further the interests of the G-Shine gang. See *Dixon v. State*, 309 Ga. 28, 34 (1) (843 SE2d 806) (2020) (evidence that crimes were in retaliation for action that was disrespectful of the gang authorized jury to determine that crimes were in furtherance of the gang's interests); *In the Interest of W. B.*, 342 Ga. App. 277, 282 (801 SE2d 595) (2017) ("Evidence showing that a crime was done in retaliation for some act or insult committed against the gang or its members will also serve to show that the crime furthered the gang's interests." (citations omitted)); see also *Boyd*, 306 Ga. at 211 (1) (b) (noting that the jury is empowered to weigh competing evidence of the motive for committing the predicate offenses to determine whether there is a nexus between the crimes and the gang's interests). Based on this evidence, the jury was

authorized to find Overstreet guilty of the two violations of the Gang Act. His challenge to the sufficiency of the evidence presented as to those two counts therefore fails.

2. Overstreet next asserts that the trial court abused its discretion by admitting testimony from a Fitzgerald police officer regarding Overstreet's guilty plea to several crimes arising from a shooting incident with members of a rival gang that occurred a few weeks before Burch's shooting. Overstreet argues that, even assuming this evidence was otherwise admissible, its prejudicial impact "far" outweighed its probative value and should have been excluded under OCGA § 24-4-403. We disagree.

OCGA § 24-4-403 provides:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Exclusion of relevant evidence under this rule is an "extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." (Citation and

punctuation omitted.) *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017). Thus, in reviewing issues under this rule, courts "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) Id. Trial court decisions under this rule regarding the admission of evidence of gang activity and membership are reviewed for an abuse of discretion. See id. at 336-337 (3).

As we have previously explained, "[a]lthough evidence of gang membership can be highly prejudicial, all inculpatory evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion." (Citations, punctuation and emphasis omitted.) *Middlebrooks v. State,* 310 Ga. 748, 751 (2) (b) (854 SE2d 503) (2021). Here, as Overstreet appears to concede, the evidence of the prior incident with the rival gang (including Overstreet's guilty plea to crimes

arising from it) was admissible under OCGA §§ 16-15-9[8] and 24-4-418 (a)[9] and, along with other evidence, helped the State establish both the existence of the G-Shine gang and Overstreet's membership and role in it. As discussed above, both showings were required to prove that Overstreet violated the Gang Act, as alleged in the indictment. Thus, the evidence was clearly probative of Overstreet's guilt as to those offenses. Moreover, while there was other evidence

---

[8] OCGA § 16-15-9 provides:

> For the purpose of proving the existence of a criminal street gang and criminal gang activity, the commission, adjudication, or conviction of any offense enumerated in paragraph (1) of Code Section 16-15-3 by any member or associate of a criminal street gang shall be admissible in any trial or proceeding. Evidence offered under this Code section shall not be subject to the restrictions in paragraph (22) of Code Section 24-8-803.

Although we held in *State v. Jefferson*, 302 Ga. 435, 441-443 & n.6 (807 SE2d 387) (2017), that the Confrontation Clause of the Sixth Amendment to the United States Constitution is violated when convictions of other people are admitted against a defendant under this statute, we explained that "nothing about this scenario can be read to suggest that a particular defendant's prior conviction could not be used against that same defendant in his or her own case under the proper circumstances." (emphasis omitted).

[9] OCGA § 24-4-418 (a) provides:

> In a criminal proceeding in which the accused is accused of conducting or participating in criminal gang activity in violation of Code Section 16-15-4, evidence of the accused's commission of criminal gang activity, as such term is defined in Code Section 16-15-3, shall be admissible and may be considered for its bearing on any matter to which it is relevant.

regarding the gang and Overstreet's participation in it (including Overstreet's own statements), thus somewhat reducing the State's need for this evidence, we cannot say that evidence of the incident with the rival gang was confusing, misleading, or unduly cumulative of the other evidence or that the trial court otherwise abused its discretion in performing the balancing required by OCGA § 24-4-403. See *Anglin*, 302 Ga. at 337 (3) (determining that the trial court did not abuse its discretion under Rule 403 by admitting evidence of defendant's gang activity). This enumeration of error therefore fails.

3. Finally, Overstreet contends that his trial counsel provided constitutionally ineffective assistance by failing to move for a change of venue. Overstreet argues that Burch's killing received "widespread pretrial publicity" and was so "high profile and notorious" in the community that it was impossible for him to receive a fair trial in Ben Hill County. Overstreet also argues that local publicity, the relatively small size of the community, the fact that Burch was a "very sympathetic" and generous individual, and the familiarity of prospective jurors with the case showed that he was

28

actually prejudiced by the trial being conducted in Ben Hill County before the jury that was selected. Based on these contentions, he argues that a motion for change of venue would have been granted had counsel filed one and that his counsel performed deficiently by not doing so. We disagree with each of these contentions and reject his claim of ineffective assistance of counsel.

> To prevail on this claim, Overstreet
>
> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [Overstreet] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [Overstreet] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citation and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad

range of professional conduct." (Citation and punctuation omitted.)

*Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016).

"The decision whether to file a motion for change of venue, as with other motions, is a matter of trial strategy or tactics." (Citation and punctuation omitted.) *Wilson v. State*, 286 Ga. 141, 143 (3) (686 SE2d 104) (2009). "[A] defendant who contends a strategic decision constitutes deficient performance must show that no competent attorney, under similar circumstances, would have made it." (Citation and punctuation omitted.) *Burrell v. State*, 301 Ga. 21, 25 (2) (d) (799 SE2d 181) (2017).

> Moreover, because trial counsel cannot be deficient for failing to file a meritless motion, [Overstreet] would have to show that a motion to change venue would have been granted had counsel made the motion. To prevail on a motion to change venue, a defendant must show either that . . . the setting of the trial was inherently prejudicial or . . . the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible.

(Citation omitted.) *Mims v. State*, 304 Ga. 851, 858-859 (2) (c) (823 SE2d 325) (2019).

(a) Overstreet presented no evidence to the trial court

regarding the reason his trial counsel did not move for a change of venue or evidence that venue in another county would have been more favorable to the defense. Overstreet thus presented nothing to show that no competent attorney, under similar circumstances, would have made the same decision. See *Mims*, 304 Ga. at 858 (2) (c) (noting that even when defense counsel consciously chooses not to move for a change of venue, the appellant must show that no competent attorney, under similar circumstances, would have made the same decision).

(b) With respect to Overstreet's contention that a motion for change of venue would have been granted had trial counsel filed one, the record shows the following. Jury selection for Overstreet's trial was conducted by questioning of panels of 14 potential jurors at a time. The jury was selected after both the prosecution and defense questioned three such panels.

The prosecutor acknowledged during jury selection that there had been local news coverage of the case and that there had been posts about the case on various social media. Each of the prospective

jurors who were interviewed acknowledged that they had heard about the case in some way, either by reading about it in the newspaper or on social media, watching local television reports, or hearing friends, neighbors, or others discussing the case. Several prospective jurors indicated that they knew the victims, potential witnesses, Overstreet's co-defendants, or family members of the witnesses or co-defendants. The record also shows that the wife of one prospective juror had been on the jury when one of Overstreet's co-defendants was tried.[10] The prosecutor, defense counsel, and several prospective jurors acknowledged that the case was "sad" and "emotional."

The record shows, however, that only one prospective juror was excused for cause based upon her pre-trial knowledge of the case that she could not set aside.[11] Each of the remaining prospective

---

[10] During voir dire, this prospective juror said that his wife had told him about the case after the trial but that he would be able to base his verdict solely on the evidence presented in the courtroom and be fair and impartial to both sides. This prospective juror was not selected for the panel.

[11] Four other prospective jurors were excused for cause because they were related to the victims or members of the district attorney's staff. Five

jurors explained to the parties and the trial court that they could set aside their prior knowledge of the case and their familiarity with people associated with the case, decide the case based upon the evidence, and be fair and impartial to both Overstreet and the State. Each member of the jury that was empaneled reaffirmed this statement under oath.

(i) Based on the record before us, Overstreet cannot demonstrate that the setting of the trial in Ben Hill County was inherently prejudicial such that a motion for new trial would have been granted had his trial counsel filed one. Although there was evidence of press coverage and other publicity surrounding the case, Overstreet has not established that what he characterizes as widespread pre-trial publicity "contained information that was unduly extensive, factually incorrect, inflammatory or reflective of an atmosphere of hostility." (Citation and punctuation omitted.) *Powell v. State*, 297 Ga. 352, 354 (2) (773 SE2d 762) (2015) (noting

---

additional jurors were excused for causes unrelated to pre-trial publicity or knowledge of the case, including religious beliefs, medical issues, personal obligations, or ineligibility.

that cases of inherent prejudice are "extremely rare"). His trial counsel was not called to testify at the hearing on the motion for new trial, and other than the prospective jurors' general responses to questioning during jury selection, he has offered no evidence "that the pretrial publicity was so pervasive as to render the trial setting inherently prejudicial." *Powell*, 297 Ga. at 355 (2).

(ii) Overstreet has likewise failed to establish that, due to pre-trial publicity, holding the trial in Ben Hill County actually prejudiced him such that a motion for change of venue would have been granted had counsel filed one. "[T]he key question in this context is whether those jurors who had heard about the case could lay aside their opinions and render a verdict based on the evidence." (Citation and punctuation omitted.) *Mims*, 304 Ga. at 859 (2) (c). Here, although each prospective juror had heard about the case in some way prior to jury selection, each of the jurors who were ultimately empaneled affirmed during voir dire that they could set aside what they had learned about the case outside the courtroom and render a verdict based solely on the evidence presented. The

only juror who expressed any sort of "fixed bias" regarding the case was excused for cause. See *Powell*, 297 Ga. at 355 (2). Because Overstreet has presented no evidence suggesting that the jurors decided the case based on something other than the evidence presented at trial, he cannot establish that he was actually prejudiced by being tried in Ben Hill County. See *Mims*, 304 Ga. at 859 (2) (c).

(iii) In light of these determinations, Overstreet cannot establish that a motion to change venue would have been granted. He therefore cannot establish that trial counsel performed deficiently by failing to file one. This claim of ineffective assistance of counsel fails.

*Judgment affirmed. All the Justices concur.*

Decided October 5, 2021.

Murder. Ben Hill Superior Court. Before Judge Hughes.

*Kathleen Strang*, for appellant.

*Bradford L. Rigby, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.