**SECOND DIVISION**
**MARKLE, J.,**
**LAND and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**February 12, 2025**

# In the Court of Appeals of Georgia

A24A1254. LEE v. THE STATE.

DAVIS, Judge.

A Fulton County jury found Jahsiah Lee guilty of participation in criminal street gang activity based on his commission of armed robbery and related offenses. Lee appeals from the trial court's denial of his motion for new trial. For the reasons that follow, we affirm the denial of Lee's motion for new trial.

Viewed in the light most favorable to the verdict,[1] the evidence at trial showed the following. Lee is a member of the criminal street gang known as the 59 Brims Bloods. Lee and Amati Moore know each other through a mutual friend, and Lee has been to Moore's apartment and seen guns and jewelry there. Lee instructed his

---

[1] See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

girlfriend, Kayla Johnson, to go to Moore's apartment for a purported social visit on the night of February 6, 2020. Johnson testified at trial that Lee actually wanted her to scope out Moore's apartment for a robbery. Upon arriving at the apartment Johnson asked Moore to order food, and Johnson later notified Lee by text message when Moore left the apartment to meet a pizza delivery driver.

As Moore was walking back to his apartment, two men wearing ski masks and gloves and holding guns ran towards him in the hallway.[2] The assailants pointed their guns at Moore, said "you know what time it is" and "we'll kill you," ripped the jewelry from his neck, forced him to the ground, and kicked and punched him. One of the assailants said "I'm Blood," and Moore recognized him as Lee based upon Lee's distinctive voice, his body demeanor, and a tattoo on his neck that says "Blood."[3] Moore called Lee by his nickname, and the other assailant said "I'm Blood" and asked if he could kill Moore, but Lee said that it would be too loud in the hallway. Moore testified that he understood the assailants' threats to mean that if he

---

[2] Surveillance video of the men entering and exiting the apartment complex was played at trial.

[3] Lee was wearing an ankle monitor as a bond condition at the time of the robbery, and GPS data from the monitor confirmed that he was at Moore's apartment at the time of the robbery.

reported Lee to authorities, someone from Lee's gang would kill him. The assailants forced Moore to let them into his apartment at gunpoint. Moore and Johnson did not recognize the second assailant, who was wearing a red bandana. The second assailant pointed his gun at Moore while Lee stole Moore's guns, jewelry, cash, and rare magazines. Lee also smashed Moore's television and cell phone. Lee and the second assailant then ordered Moore to lay down on the floor before fleeing the apartment.

Moore approached a security guard in the apartment complex's parking garage and had the guard call 911. Police officers responding to the scene discovered an unfired bullet round and a pizza on the ground in the hallway, and observed that Moore was injured and that his apartment had been "rummaged through." An online video posted by a member of Lee's gang before the robbery showed one of the guns used in the robbery, while online photographs posted by one of Lee's friends after the robbery showed some of the jewelry and gun clips stolen from Moore. After Lee was arrested for the robbery, he made a jail phone call where he referred to events that happened with other criminal street gang members that resulted in their death following disputes, and he asked his associate to put a "bat signal out."

Lee was charged by indictment with participation in criminal street gang activity (OCGA § 16-15-4 (a)), first-degree home invasion (OCGA § 16-7-5 (b)), armed robbery (OCGA § 16-8-41), aggravated assault with a deadly weapon (OCGA § 16-5-21), aggravated assault (OCGA § 16-5-21), possession of a firearm during the commission of a felony (OCGA § 16-11-106), battery (OCGA § 16-5-23.1), and criminal trespass (OCGA § 16-7-21).[4] The jury acquitted Lee of battery but found him guilty of all other charges. The trial court merged the two aggravated assault convictions into the armed robbery conviction and sentenced Lee to a total of twenty-five years, with the first twenty years to be served in confinement and the remaining five years to be served on probation. Lee filed a motion for new trial, which the court denied after a hearing. Lee then filed this appeal, in which he challenges the court's discharge of a juror, its admission of gang evidence, and its jury instructions. Because these challenges lack merit, we affirm.

1. Lee argues that the trial court erred by discharging Juror Number 17 due to her prepaid personal vacation and replacing her with an alternate before deliberations

---

[4] Johnson was charged in the same indictment with the same offenses as Lee except participation in criminal street gang activity. Johnson was granted derivative use immunity and pled guilty after testifying at Lee's trial.

began. Lee asserts that there is no evidence that Juror Number 17 (a) paid for her trip prior to being selected as a juror, or (b) could not continue as a juror because she could not alter her travel plans or her plans would create a hardship or distraction for her. We disagree and conclude that the trial court did not abuse its discretion by discharging Juror Number 17.

"OCGA § 15-12-172 vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists." *Morrell v. State*, 313 Ga. 247, 263 (3) (869 SE2d 447) (2022); see OCGA § 15-12-172 ("If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated."). "The trial court may remove a juror even after deliberations have begun, . . . so long as the facts presented to the court show some sound basis upon which the court exercises its discretion to remove the juror." (Citations and punctuation omitted.) *Ware v. State*, 305 Ga. 457, 462 (3) (826 SE2d 56) (2019). Additionally, in regard to a juror's conflict with trial

proceedings due to impending travel plans, the Supreme Court of Georgia has stated that "a trial court's broad discretion is properly exercised in such cases after due consideration of the totality of the circumstances surrounding the juror's travel plans." Id. "This Court will not reverse a trial court's decision to remove a juror from a panel absent an abuse of discretion." *Smith v. State*, 335 Ga. App. 497, 498 (1) (782 SE2d 305) (2016).

At voir dire on February 2, 2022, the trial court advised the venire panel that the trial was expected to last until February 8 or 9 and that a juror could be excused from jury duty due to an undue burden or serious hardship based on a conflicting prepaid personal vacation. However, the trial ran longer than expected,[5] and after the State rested on February 8, Juror Number 17 indicated that she had a personal trip and flight that she had "already paid for" scheduled on the afternoon of February 10. Before deliberations began on the morning of February 10, the trial court excused Juror Number 17, finding that it would be inappropriate for her to begin deliberations with time pressure due to her looming trip, and replaced her with an alternate.

---

[5] One of the trial days was delayed by several hours due to a security issue at the courthouse.

"Courts in other jurisdictions have held that good cause, which may encompass any of the inevitable vagaries of the many trial participants' complex lives, includes prearranged business or personal travel plans, whether they come to light during voir dire or not." (Citation and punctuation omitted.) *Ware*, supra, 305 Ga. at 462 (3); see, e.g., *United States v. Jones*, 747 Fed. Appx. 348, 355-356 (III) (6th Cir. 2018) (trial court did not abuse its discretion by discharging juror whose prearranged travel plans and business obligations conflicted with the proposed trial schedule); *Commonwealth v. Colton*, 477 Mass. 1, 16 (2) (e) (Mass. Sup. Ct. 2017) (trial court did not abuse its discretion by discharging juror due to his impending flight).

"Based on the trial court's statements and questioning during voir dire, [Juror Number 17] had a reasonable expectation that she would be discharged prior to her scheduled flight." *Ware*, supra, 305 Ga. at 462 (3). Because the trial ran longer than expected and because deliberations conflicted with Juror Number 17's prepaid trip, we cannot say that the trial court abused its discretion by discharging her. See id. at 460-463 (3) (trial court did not abuse its discretion by discharging juror during deliberations where the length of trial exceeded expectations and deliberations conflicted with the juror's scheduled flight to a wedding); *Hines v. State*, 320 Ga. App.

854, 860-861 (2) (b) (740 SE2d 786) (2013) (trial court did not abuse its discretion by discharging juror during deliberations because he was distracted by his need to make a business trip). Given the timing of the trial and Juror Number 17's indication that she had "already paid for" her flight, we disagree with Lee's assertion that there is no evidence that this juror made her travel plans before being selected to serve. And while Juror Number 17 did not specifically state that her travel plans prevented her from serving, the trial court was permitted to find that it would be inappropriate for her to participate in deliberations with time pressure caused by her looming plans. Accordingly, the trial court did not abuse its discretion by discharging Juror Number 17.[6]

2. Next, Lee argues that the trial court abused its discretion by admitting evidence regarding his gang affiliation and his commission of prior gang activity pursuant to OCGA § 24-4-418 (a). Lee asserts that this evidence was unnecessary and unfairly prejudicial and was therefore inadmissible under OCGA § 24-4-403 because

---

[6] We note that Lee "does not contend that the alternate juror who replaced [Juror Number 17] was not qualified to serve." (Citation omitted.) *Ware*, supra, at 463 n.4 (3); see also *Reynolds v. State*, 271 Ga. 174, 175 (2) (517 SE2d 51) (1999) ("The defendant in a criminal proceeding has no vested interest in the service of any particular juror, but is entitled only to a legal and impartial jury.").

other evidence amply established that he was a gang member. We disagree and conclude that the trial court did not abuse its discretion by admitting the challenged evidence.

At trial, Lee's counsel admitted to the jury that Lee was a member of the 59 Brims Bloods gang. However, Lee's counsel disputed that Lee committed the robbery of Moore or that such offense was intended to further the gang's interests. Lee testified that he was a member of the gang, but he denied committing the robbery or any other crimes for the gang, and he claimed that his role in the gang was limited to planning parties and settling disputes between members.

The State called a special agent with the GBI's State Gang Task Force to testify as an expert witness on criminal street gangs. The trial court instructed the jury that this witness's testimony was related only to the charge of criminal street gang activity. The expert witness discussed the history of the Bloods gang nationwide and testified that the 59 Brims Bloods was a metro Atlanta gang affiliated with it. He testified that the 59 Brims Bloods gang uses the color red as an identifier and has been linked to homicides, robberies, and firearm and drug offenses.

The expert witness also testified that he previously conducted an investigation into the 59 Brims Bloods and identified Lee as a member of the gang. He stated that during this investigation officers initiated a traffic stop on a vehicle occupied by Lee and two other gang members, the vehicle contained gang symbols or identifiers as well as marijuana and firearms, and he charged Lee and his associates with offenses based on their possession of these latter items. He explained that Lee promoted his affiliation with the gang by posting videos and photographs online that showed common gang identifiers, including using certain hand signs, wearing certain clothing such as red bandanas, and displaying firearms, drugs, tattoos, and other gang members. The State showed the jury some of these videos and photographs, including a video titled "Robbery" where Lee discussed taking someone's firearms. The expert witness testified that the day before Moore's robbery, Lee posted a video where he said "we hitting licks," which was a term for conducting robberies.

OCGA § 24-4-418 (a) provides that "[i]n a criminal proceeding in which the accused is accused of conducting or participating in criminal gang activity in violation of Code Section 16-15-4, evidence of the accused's commission of criminal gang activity, as such term is defined in Code Section 16-15-3, shall be admissible and may

be considered for its bearing on any matter to which it is relevant." However, OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Evidence that is otherwise admissible under Rule 418 may be excluded by Rule 403. *McKinney v. State*, 318 Ga. 566, 571 (899 SE2d 121) (2024).

Still, "[e]xclusion of relevant evidence under [Rule 403] is an extraordinary remedy, which should be used only sparingly, and the balance should be struck in favor of admissibility." (Citation and punctuation omitted.) *Overstreet v. State*, 312 Ga. 565, 575 (2) (864 SE2d 14) (2021). "Thus, in reviewing issues under this rule, courts look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." (Citation and punctuation omitted.) Id. "The prejudicial effect of evidence is unfair if the evidence has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." (Citation

11

omitted.) *Jackson v. State*, 317 Ga. 95, 102 (2) (a) (891 SE2d 866) (2023); see also *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) ("The major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.") (citation and punctuation omitted). Significantly, "although evidence of gang membership can be highly prejudicial, all inculpatory evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion." (Citation and punctuation omitted.) *Overstreet*, supra, 312 Ga. at 575 (2). "Trial court decisions under this rule regarding the admission of evidence of gang activity and membership are reviewed for an abuse of discretion." Id.

We conclude that the trial court did not abuse its discretion in finding that the probative value of the gang evidence at issue was not substantially outweighed by the danger of unfair prejudice. To convict Lee of participating in criminal street gang activity, the State had to prove that (1) he was associated with the 59 Brims Bloods; (2) the 59 Brims Bloods was a "criminal street gang," which is defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang

activity"; (3) he committed first-degree home invasion, armed robbery, and aggravated assault, which are predicate acts identified in OCGA § 16-15-3 (1) (J)[7]; and (4) the commission of those offenses was intended to further the interests of the 59 Brims Bloods. See OCGA § 16-15-4 (a); *Mahogany v. State*, 366 Ga. App. 750, 753 (1) (e) (884 SE2d 141) (2023). "The fourth element requires that the State prove some nexus between the act and the intent to further street gang activity," which "can be established by proof of the defendant's association with a gang and participation in its activities before and during the crimes charged." (Citation and punctuation omitted.) *Dunn v. State*, 312 Ga. 471, 474 (1) (863 SE2d 159) (2021).

Although Lee admitted that he was a member of the 59 Brims Bloods, he disputed that he committed the robbery of Moore or that such offense was intended to further the gang's interests.[8] Thus, the State had to provide evidence establishing

---

[7] Under OCGA § 16-15-3 (1) (J), "criminal gang activity" includes any crime involving "violence, possession of a weapon, or use of a weapon."

[8] We note that the State "retains broad control over how to present its case, so a defendant cannot always keep out damaging evidence simply by offering to stipulate to the element of a crime that such evidence would tend to prove." *Hood*, supra, 299 Ga. at 102 (4). And "[a]n offer to stipulate to an issue does not eliminate the relevance of the issue under Rule 401 but rather is one factor that the court should consider in making the determination under Rule 403." Id. at 102 n.4 (4).

the third and fourth elements of the crime of participation in criminal street gang activity. Given the need to establish the elements of the offense, the evidence of Lee's prior gang activity involving firearms, his discussion of robberies, and his gang identifiers had significant probative value in establishing a nexus between the armed robbery of Moore, which also involved gang identifiers, and the intent to further the gang's interests. See *Overstreet*, supra, 312 Ga. at 576 (2) ("[W]hile there was other evidence regarding the gang and [the defendant's] participation in it (including [the defendant's] own statements), thus somewhat reducing the State's need for this evidence, we cannot say that evidence of the incident with the rival gang was confusing, misleading, or unduly cumulative of the other evidence or that the trial court otherwise abused its discretion in performing the balancing required by OCGA § 24-4-403."); see also *In the Interest of D. M.*, 307 Ga. App. 751, 752 (1) (706 SE2d 683) (2011) (expert testimony, that perpetrator's wearing of gang colors at the time of the predicate shooting was a proclamation that the shooting was a gang act, established a nexus between the shooting and an intent to further gang activity).

Moreover, we have previously noted that criminal intent may be difficult to prove, further underscoring the State's need to use the evidence at issue to establish

an intent to further the interests of the 59 Brims Bloods. See *McKibbons v. State*, 226 Ga. App. 452, 453 (1) (486 SE2d 679) (1997) ("Criminal intent rarely can be proved by direct evidence, but its existence may be inferred by the trier of fact upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted.") (citation omitted). And the evidence of the history of Lee's gang and its commission of robberies helped establish a nexus between the robbery of Moore and the gang and helped provide context for the evidence of Lee's prior gang activity. See *Middlebrooks v. State*, 310 Ga. 748, 751 (2) (b) (854 SE2d 503) (2021) (trial court did not abuse its discretion in finding that the probative value of gang evidence in establishing the context and motive for the charged offenses was not substantially outweighed by the danger of unfair prejudice).

Accordingly, the trial court did not abuse its discretion in admitting evidence regarding Lee's gang affiliation and his prior gang activity.

3. Finally, Lee argues that the trial court erred in instructing the jury on the elements of participation in criminal street gang activity. Specifically, Lee asserts that

the court relieved the State of its burden to prove that he committed the predicate offenses with the intent to further his gang's interests by instructing that the State only needed to show "[t]hat the crime was committed to further the interest of the gang or that the crime committed is the type of crime that members of the alleged gang are known to commit." We disagree and conclude that when considered as a whole, the court's instructions were not improper.

"We review de novo an allegedly erroneous jury instruction, which is a legal question." (Citation omitted.) *Wright v. State*, 365 Ga. App. 288, 289 (1) (878 SE2d 137) (2022).

> In assessing an assertion of an erroneous jury instruction, the instruction must be evaluated in the context of the trial court's jury instructions as a whole. The only requirement regarding jury charges is that the charges, as given, were correct statements of the law and, as a whole, would not mislead a jury of ordinary intelligence.

(Citation and punctuation omitted.) Id. "Additionally, an erroneous charge does not warrant a reversal unless it was harmful and, in determining harm, the entirety of the jury instructions must be considered." (Citation and punctuation omitted.) Id. "Where a charge as a whole substantially presents issues in such a way as is not likely

16

to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, a reviewing court will not disturb a verdict amply authorized by the evidence." (Citation omitted.) *White v. State*, 291 Ga. App. 249, 251 (661 SE2d 865) (2008).

OCGA § 16-15-4 (a) provides that "[i]t shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." Our Supreme Court has held that based on the statute's use of the preposition "through," an essential element of the offense is a "nexus between the act and an intent to further street gang activity." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009). In other words, "[p]roof that the commission of the predicate act was intended to further the interests of the gang is essential to prove a violation of OCGA § 16-15-4 (a)." (Citation and punctuation omitted.) *Nolley v. State*, 335 Ga. App. 539, 543 (1) (782 SE2d 446) (2016).

Here, the trial court instructed the jury that the State had to prove four elements to support the charge of participation in criminal street gang activity. The first three elements the court identified were that there was a criminal street gang, that

17

Lee was associated with the gang at the time of the alleged crimes, and that he participated in criminal street gang activity. As to the fourth element, the court explained that the State had to prove "that there is a nexus or connection between the crimes that were committed and the gang. That is the crime was committed to further the interest of the gang or that the crime committed is the type of crime that members of the alleged gang are known to commit." As an initial matter, we note that this instruction largely tracked the pattern jury instructions for this offense, which pertinently provide that the State must prove "that there is a nexus between the crime committed and the gang, that the crime was committed to further the interests of the gang; meaning proof that the crime committed was the sort of crime that the gang does." Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 2.02.25 (4th ed. 2024).

Significantly, the trial court unequivocally instructed the jury that the State needed to show a nexus or connection between Lee's crimes and the gang. The court then explained that such nexus or connection meant that the crime was committed to further the gang's interests or that the crime was the type of crime that members of the gang are known to commit. While the latter phrase does not track precisely the

suggested pattern jury instructions, when the jury instructions here are considered as a whole it is apparent that the court did not authorize the jury to find Lee guilty simply because he committed a category of crime that members of his gang are known to commit.[9] Again, the court explained that the State needed to show a nexus or connection between Lee's crimes and the gang, and a jury of ordinary intelligence would not be misled to think that such nexus or connection existed simply because Lee committed a robbery and his gang commits robberies. Instead, a review of the instructions as a whole shows that the court was simply explaining, albeit imperfectly, that the phrases "the crime was committed to further the interest of the gang" and "the crime committed is the type of crime that members of the alleged gang are known to commit" had the same or similar meanings. In other words, a showing that Lee's

---

[9] The court attempted to charge the jury in a conversational tone, stating that it wanted the charges to be "accessible" and something the jury would "understand if we were just talking about it over a cup of coffee." While we appreciate the court's well-intentioned approach, this case demonstrates some of the issues that may arise from such an approach. "[T]he better practice is for the court to follow the specific language of the statute at issue or the suggested pattern jury instructions, but such strict compliance is not required as long as the principle of law set forth is sufficiently imparted to the jurors." *Daniels v. State*, 264 Ga. 259, 261 n.4 (2) (443 SE2d 622) (1994).

crime was the type of crime that members of his gang are known to commit meant that he acted with the intent to further his gang's interests.

Additionally, the indictment alleged that Lee "did unlawfully, while associated with a criminal street gang known as the 'Brims,' participate in criminal gang activity through commission" of first-degree home invasion, armed robbery, aggravated assault with a deadly weapon, and aggravated assault. The trial court read the indictment to the jury, instructed the jury that the State bore the burden of proving the allegations in the indictment beyond a reasonable doubt, and provided the jury with the indictment during deliberations. Therefore, the indictment's allegation that Lee participated in gang activity "through" the predicate crimes highlighted the State's burden of showing a nexus or connection between the crimes and Lee's gang and of showing that he committed the crimes with the intent to further his gang's interests. See *Jackson v. State*, 306 Ga. 706, 712 (3) (b) (832 SE2d 809) (2019) (trial court's jury charge "fairly covered the essential elements" of participation in criminal street gang activity, where it explained that the State needed to show that the defendant "conducted or participated in criminal street gang activity through the commission of an actual criminal act," and it defined "criminal street gang activity"

as the commission of certain offenses "by a confessed or proven gang member"); see also *State v. Thomas*, 350 Ga. App. 763, 767 (1) (830 SE2d 296) (2019) ("A trial court may cure an erroneous jury instruction by providing the jury with the indictment and instructing the jury that the State was required to prove every material allegation in the indictment and every essential element of the crime charged beyond a reasonable doubt.") (citation and punctuation omitted).

We also note that the State's expert witness testified that in order to convict Lee of the gang charge, the State needed to show that "the crime is connected somehow or done through that criminal street gang. It's what's referred to as a nexus, okay. So just because a gang member goes out and commits a crime doesn't automatically make them guilty of a gang offense. There has to be some type of connection between that crime that they committed and the gang." See *MacMillan v. State*, 372 Ga. App. 796, 806 (2) ( 906 SE2d 876) (2024) ("[A]lthough it was not a jury instruction given with the authority of the court, prejudice resulting from the challenged jury instructions was also mitigated by the State when it told the jury about the accomplice-corroboration requirement . . . during its closing argument."). Accordingly, there was no reversible error in the trial court's jury instructions.

For the foregoing reasons, we affirm Lee's judgment and sentence and the denial of his motion for new trial.

*Judgment affirmed. Markle and Land, JJ., concur.*