306 Ga. 204
FINAL COPY

S19A0018.  BOYD v. THE STATE.

WARREN, Justice.

Kevin Boyd was convicted of felony murder and other crimes in

connection with the shooting death of Ray Murphy.[1]  On appeal,

Boyd contends that the evidence was insufficient to support his

---

[1] The crimes occurred on August 10, 2013.  On October 25, 2013, a Walton County grand jury indicted Boyd for the malice murder of Ray Murphy (Count 1); felony murder predicated on the aggravated assault of Murphy (Count 2); felony murder predicated on the armed robbery of Murphy (Count 3); armed robbery of Murphy (Count 4); aggravated assault with a deadly weapon of Murphy (Count 5); aggravated assault with a deadly weapon of Eric Mann (Count 6); aggravated assault with intent to rob Murphy (Count 7); violation of the Street Gang Terrorism and Prevention Act (Count 8); possession of a firearm during the commission of a felony (Count 9); and possession of a firearm by a convicted felon (Count 10).  At a trial held from February 9-10, 2015, the trial court directed a verdict of not guilty for possession of a firearm by a convicted felon, and the jury found Boyd not guilty of malice murder but guilty of all remaining counts.  The court sentenced Boyd to serve life in prison without parole for felony murder predicated on aggravated assault of Murphy, a concurrent life sentence for armed robbery of Murphy, twenty years concurrent for aggravated assault of Mann, fifteen years concurrent for violating the Gang Act, and five years consecutive for possession of a firearm during the commission of a felony.  The remaining counts were vacated or merged.  Boyd filed a timely motion for new trial, which was amended through new counsel and denied, as amended, without a hearing.  Boyd filed a timely notice of appeal on July 10, 2018, and the case was docketed in this Court for the term beginning in December 2018 and submitted for a decision on the briefs.

convictions and that the trial court erred in several ways. Finding no error, we affirm.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On the night of August 10, 2013, Ray Murphy and his friend Eric Mann went to a house at 718 Reed Street in Monroe, Georgia, to purchase methamphetamine. Earlier that day, Murphy had contacted B. J. Crutchfield to arrange the buy. Rather than conduct the drug deal himself, Crutchfield passed it off to Kevin Boyd and Blake Harris. Boyd then spoke on the phone with someone about a drug deal. According to Adrian Ansley, Boyd's girlfriend at the time, she, Boyd, Harris, and Crutchfield were all members of the 9 Trey Gangstas, a sub-group of the Bloods gang.[2] Sometime after overhearing Boyd's phone discussion, Ansley drove Boyd and Harris to pick up the drugs and, after that, drove them to Reed Street. At some point, Boyd told her that he was going to give the purchasers less drugs than the

---

[2] Ansley said that she was initiated into the 9 Trey Gangstas by being "jumped in."

agreed-upon amount; in other words, Boyd planned to shortchange the deal. Ansley observed that Boyd had a gun while in her car, but by the time Boyd and Harris got out of her car, Harris had taken possession of the gun.

The house on Reed Street was Jurshia Jones's, who was at that time pregnant with Boyd's child. Boyd arrived while Jones was in the shower, and, shortly after that, he told Jones's young daughter to leave the living room and go to Jones's room. Around this time, Murphy and Mann showed up; Mann's wife had driven them there.

Boyd exited the house and approached the car to escort Murphy and Mann inside. Once inside the house, they all sat down in the living room. While conversing with Murphy, Boyd pulled out a bag and at least twice said the phrase "baby mama" as an apparent signal to Harris because Harris (not Jones, who was pregnant with Boyd's child and whom he would refer to as "baby mama") then entered the room and pointed a gun at Mann and Murphy. Boyd then said, "y'all already know what it is," which Mann understood as meaning that he and Murphy were being robbed.

3

According to Mann, Boyd and Harris started digging through Mann's and Murphy's pockets and telling them to "give it up." Pushing Boyd's hands away from Mann's pockets, Mann tried to escape through the front door. As Mann began opening the door, Harris approached him from behind and hit him across the side of the head with a gun, which then fired.

Upon hearing the gunshot, Murphy tried to escape by jumping through a window. According to Mann, Harris turned to Murphy and shot at him, hitting him in the buttocks. Mann then escaped through the door and ran toward his wife's car. Shots were being fired at Mann as he ran away, but he made it to the car without being hit and his wife drove away quickly. Murphy, already wounded, made it out of the house, but Harris followed him into the yard and shot him in the shoulder.[3] Harris attempted to get money

---

[3] The jury also heard testimony from a neighbor who lived across the street from Jones's residence. She testified to seeing Murphy and Mann arrive at the Reed Street house and enter it. She also testified that after hearing the first gunshot, she saw Mann exit the house running and saw Boyd shooting at him.

from Murphy, not knowing that Boyd had already done so. Murphy died shortly thereafter at the hospital. A state medical examiner testified at trial that either of the two gunshots could have been fatal, but the shot to Murphy's buttocks hit the femoral artery and caused fatal bleeding. Additionally, Murphy had injuries consistent with jumping through a window, which, based on other testimony, appeared broken from the inside out. From the crime scene, investigators recovered spent 9-millimeter shell casings in the house and the front yard, a spent 9-millimeter bullet lodged into the wall inside the house near the door, and an unspent 9-millimeter bullet.

After the shooting, Boyd's cousin drove Boyd and Harris to a night club in Monroe, then to a night club in Gwinnett County. From there — and at the behest of Terry Brown, who described himself as having "seniority over" Boyd within the 9 Trey Gangstas — Boyd and Harris went to a house in Atlanta that was a Bloods "hang out," where Boyd stayed to "get away" from Monroe until being arrested three days later. Harris returned to Monroe before Boyd's arrest. Ansley also went to the Atlanta house and stayed there until she

5

was arrested shortly before Boyd. When Ansley was arrested, police recovered a Smith & Wesson 9-millimeter handgun from her purse that she testified was the gun Boyd possessed the day of the shooting. A GBI firearms expert later examined and tested the Smith & Wesson 9-millimeter handgun that had been recovered from Ansley, and also the spent shell casings and bullets that police recovered during their investigation of the crime scene. The expert testified that all of the shell casings and bullets were of the same caliber and from the same manufacturer, and that the spent rounds were all fired from the Smith & Wesson 9-millimeter handgun that police recovered from Ansley's purse.

At trial, Brown testified that Boyd called on the night of the shooting and told him that he needed to get out of Monroe because he had "committed murder." Brown told Boyd to come to Atlanta to stay in a house there, which he (and Ansley) described as a "hang out" for members of the Bloods. Brown testified that when Boyd showed up, Boyd had a gun and was nervous like "his mind was somewhere else." According to Brown, Boyd's version of events

6

recounted a drug deal gone wrong.  Specifically, he told Brown that "he was making a drug deal, that he thought the victim was going to try to rob him first," and that "the man stood up[, so Boyd] stood up, pulled out the gun and when he pulled out the gun the man tried to go out the window and [Boyd] shot him."  Brown later went to Monroe and spoke with Harris about what happened.  While there, Brown said, Harris told Brown that Boyd shot Murphy in the buttocks, then gave the gun to Harris, who pursued Murphy into the yard and shot him a second time.

Brown also testified about the gang affiliations of Boyd, Harris, Crutchfield, and Ansley.  He testified that Boyd and Ansley were members of the 9 Trey Gangstas, a sub-group of the Bloods.  According to Brown, Harris was a member of a different Bloods sub-group, and Crutchfield was not a member of the Bloods, but was a friend of the gang.  Crutchfield denied any gang affiliation and testified that he did not remember any of the relevant events.  However, investigators discovered on Boyd's cellular phone a text message that Crutchfield had sent Boyd hours before the drug deal

7

and murder that contained the 9 Trey Gangstas oath. Finally, Brown testified that the drug deal was not carried out at the behest of the Bloods.

1. Boyd first contends that the evidence was insufficient to support his convictions. For the reasons explained below, we disagree.

When evaluating challenges to the sufficiency of the evidence, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018). We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences derived from the facts. *Jones*, 304 Ga. at 598. "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." *Williams v. State*, 287 Ga.

199, 200 (695 SE2d 246) (2010) (citation and punctuation omitted).

(a) To support Boyd's conviction for felony murder, the State was required to prove that Boyd proximately caused, either directly or as a party to the crime, Murphy's death while in the commission of aggravated assault. See OCGA § 16-5-1 (c); *Menzies v. State*, 304 Ga. 156, 161 (816 SE2d 638) (2018). "A person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury[.]" OCGA § 16-5-21 (a) (2). And the trial court charged the jury on Georgia's "party to a crime" statute, which provides that "[e]very person concerned in the commission of a crime," including one who "[d]irectly commits the crime" or "[i]ntentionally aids or abets in the commission of the crime" is "a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a), (b) (1), (3). "While mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from

presence, companionship, and conduct before, during and after the offense." *McGruder v. State*, 303 Ga. 588, 591 (814 SE2d 293) (2018) (citation and punctuation omitted).

The evidence presented at Boyd's trial showed, among other things, that he agreed to sell methamphetamine; possessed a Smith & Wesson 9-millimeter handgun, which he gave to Harris on the way to the drug transaction; and escorted Murphy and Mann into the house where Harris remained out of sight until Boyd verbally signaled for him to appear. Boyd then said to Murphy and Mann, "y'all already know what it is," which Mann understood to mean they were being robbed. Boyd and Harris then emptied Murphy's and Mann's pockets at gunpoint, telling them to "give it up," before Harris, Boyd, or both men shot Murphy and shot at Mann. Boyd and Harris left the scene together, and after Boyd telephoned Brown — a more senior 9 Trey Gangstas member — and told him that Boyd had "committed murder," Boyd and Harris traveled to the Atlanta safe house together, where Boyd remained until his arrest three days later. This evidence was sufficient to authorize a rational jury

to find beyond a reasonable doubt that Boyd was guilty, at least as a party to the crimes of armed robbery and aggravated assault, as charged in the indictment;[4] that the predicate crime of aggravated assault against Murphy proximately caused Murphy's death, thus supporting Boyd's felony-murder conviction; and that Boyd was guilty of possession of a firearm during the commission of a felony.[5] See, e.g., *Green v. State*, 304 Ga. 385, 389-390 (818 SE2d 535) (2018); *Menzies*, 304 Ga. at 159-162; *Ellis v. State*, 292 Ga. 276, 278-279 (736 SE2d 412) (2013).

(b) Count 8 of the indictment alleged that Boyd was "associated with '9 Trey Gangsters[,]' a criminal street gang," and that he "participate[d] in criminal gang activity through the commission of the offense of Armed Robbery and Aggravated

---

[4] Georgia's armed robbery statute provides: "A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon, or any replica, article, or device having the appearance of such weapon." OCGA § 16-8-41 (a).

[5] In Georgia, it is also a crime for "[a]ny person [to] have on or within arm's reach of his or her person a firearm . . . during the commission of, or attempt to commit . . . Any crime against or involving the person of another . . . and which crime is a felony." OCGA § 16-11-106 (b).

11

Assault as alleged in Counts 4, 5, 6 and 7 of [the] Indictment by using a firearm to commit said offenses in violation of O.C.G.A. [§] 16-15-4." Subsection (a) of OCGA § 16-15-4 provides, "It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." OCGA § 16-15-3 (1) (A) and (J), in turn, provide that "'[c]riminal gang activity' means the commission, attempted commission, [or] conspiracy to commit . . . [a]ny offense defined as racketeering activity by Code Section 16-14-3" which includes violations of the Georgia Controlled Substances Act, see OCGA § 16-14-3 (5) (A) (xxxiv), as well as "[a]ny criminal offense . . . that involves violence, possession of a weapon, or use of a weapon[.]"

The State was required to prove four elements to establish that the defendant violated the Street Gang Terrorism and Prevention Act as alleged in the indictment: (1) "the existence of a 'criminal street gang,' defined in OCGA § 16-15-3 (2) as 'any organization,

12

association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's "association with the gang"; (3) that the defendant "committed one of the offenses identified in OCGA § 16-15-3 (1)"; and (4) "that the crime was intended to further the interests of the gang." *McGruder*, 303 Ga. at 591-592 (citing OCGA §§ 16-15-3; 16-15-4 (a); *Anthony v. State*, 303 Ga. 399, 400-401 (811 SE2d 399) (2018); and *Rodriguez v. State*, 284 Ga. 803, 807 (671 SE2d 497) (2009)). A review of the record in this case reveals that two of the four elements — that Boyd was a member of the 9 Trey Gangstas gang, and that he committed the predicate crimes of armed robbery and aggravated assault, as discussed above — are easily met based on the evidence offered at trial. The other two elements—that the 9 Trey Gangstas was a "criminal street gang," and that Boyd's crimes were intended to further the interests of the gang—are closer questions and therefore require further analysis.

With respect to the first element, we have explained that "the commission of an enumerated offense by the defendant is not itself

sufficient to prove the existence of a 'criminal street gang'" because "[a]n isolated offense by a single member does not fulfil" the statutory requirement of a "group of three or more persons [which] engage[s] in criminal gang activity." (Punctuation omitted.) *Rodriguez*, 284 Ga. at 808; see also OCGA § 16-15-3 (3). But we have also clarified that evidence that *multiple* gang members *conspired* to engage in underlying crimes constituting "criminal gang activity," as defined in OCGA § 16-15-3 (1) and (2), *can be* proof of a gang's "existing, ongoing criminal activity." *Hayes v. State*, 298 Ga. 339, 342 (781 SE2d 777) (2016) (affirming Gang Act conviction where the "evidence showed that the defendants at least informally associated with one another in criminal gang activity by conspiring to commit armed robbery" and where the jury "could have interpreted their actions . . . as their way of claiming affiliation with" a specific gang). These principles align with the relevant statutes. Indeed, OCGA § 16-15-3 (1) provides that "'[c]riminal gang activity' means the commission, attempted commission, *conspiracy to commit*, or the solicitation,

14

coercion, or intimidation of another person to commit any" of the offenses listed in that statute. (Emphasis supplied.)

Here, when viewed in the light most favorable to the verdict, the State presented witnesses who testified about the following gang-related evidence: the 9 Trey Gangstas were a gang and sub-group of the larger Bloods gang; Boyd, Harris, Ansley, and Crutchfield, who were all involved in the drug deal or predicate offenses, were either members of, or affiliated with, the 9 Trey Gangstas; and members were "jumped in" to the 9 Trey Gangstas gang. The State also tendered a photograph of Boyd and another gang member "throwing up" 9 Trey Gangstas gang signs. Although the State did not offer a gang expert or elicit other testimony or evidence to establish the relatively straightforward proposition that the 9 Trey Gangstas or Bloods engaged in criminal gang activity as a general matter, the State did present sufficient evidence that Boyd, Harris, Ansley, and Crutchfield were part of a group that conspired to engage in "criminal street gang activity" as defined by OCGA § 16-15-3 (1): here, the sale of methamphetamine in violation

15

of the Georgia Controlled Substances Act. This evidence included Crutchfield "passing off" the drug sale to Boyd and Harris, who then enlisted Ansley to drive them to get drugs and to the Reed Street house where the crimes took place. Crutchfield also texted the 9 Trey Gangsta oath --- which, among other things, included the phrase, "blood in blood out" — to Boyd hours before the crimes. This evidence of three or more persons' conspiracy and participation in criminal gang activity was sufficient to establish the existing and ongoing criminal activity of the 9 Trey Gangstas, thus establishing its existence as a "criminal street gang" in this case. See, e.g., *Parks v. State*, 304 Ga. 313, 318-319 (818 SE2d 502) (2018); *McGruder*, 303 Ga. at 592; *Hayes*, 298 Ga. at 341-342.

To satisfy the fourth and final element of a violation of the Gang Act, the State must prove that "the commission of the predicate act was intended to further the interests of the [gang]." *Stripling v. State*, 304 Ga. 131, 134 (816 SE2d 663) (2018) (citation and punctuation omitted); see also *Rodriguez*, 284 Ga. at 807 ("[T]here must be some nexus between the act and an intent to

16

further street gang activity." (punctuation omitted)). "[C]riminal intent is a question for the jury and may be inferred from conduct before, during and after the commission of the crime." *Ware v. State*, 303 Ga. 847, 849 (815 SE2d 837) (2018) (citation and punctuation omitted); see also *Morris v. State*, 340 Ga. App. 295, 300-301 (797 SE2d 207) (2017) (applying this concept in concluding there was sufficient evidence of criminal intent to further the interests of a gang).

Here, although Brown claimed that the drug deal was not done for the Bloods' benefit, the State presented other evidence from which a jury could reasonably infer a nexus between the predicate crimes and an intent to further the interests of the 9 Trey Gangstas, or of the Bloods (of which 9 Trey Gangstas was a sub-group) more generally. That evidence included that Crutchfield texted the gang's oath to Boyd in the hours before the drug deal and armed robberies, aggravated assaults, and murder. See *Nolley v. State*, 335 Ga. App. 539, 543 (782 SE2d 446) (2016) (evidence that "connected the planning and execution" of the predicate crime included "gang

17

symbols in a text message"). In addition, Boyd, Harris, and Ansley, who were all members of 9 Trey Gangstas, worked together to prepare for the drug deal, and all three were aware that a firearm would be involved in the transaction. It was therefore reasonably foreseeable that the drug transaction could devolve into violence. See *Davis v. State*, 290 Ga. 757, 761 (725 SE2d 280) (2012).

To be sure, some evidence — such as Mann's testimony — could have been construed to suggest that Boyd and Harris simply planned to rob Mann and Murphy without ever conducting the drug transaction in the first place, and that Boyd and Harris therefore were not working at the behest of the gang when they committed the charged crimes. But other evidence presented at trial indicated that Boyd and Harris actually intended to carry out the drug deal — though perhaps a "dirty" version of it where they shortchanged the buyers — and that the deal took an unplanned, but reasonably foreseeable, violent turn. That evidence included that Boyd and Harris asked Ansley to drive them to pick up the drugs for the deal; that Boyd told Ansley that he planned to shortchange the deal (as

18

opposed to not conducting the deal at all); and the story Boyd conveyed to Brown that he "was making a drug deal, [but] that he thought the victim was going to try to rob him first," so Boyd pulled a gun and fired. The jury was therefore authorized to weigh the relevant evidence and credit witness testimony suggesting that Boyd and Harris were acting on behalf of the 9 Trey Gangstas when they committed the relevant crimes. See *Menzies*, 304 Ga. at 160-161.

Finally, Boyd's actions after the crimes provide further evidence of nexus between the crimes and the gang's interests. In the hours after the crimes, Boyd called Brown, a more senior gang member in 9 Trey Gangstas, seeking help, and Brown directed him and Harris to a Bloods "hang out" in Atlanta, where Boyd went to "get away" — a location where Boyd remained, along with Ansley, until their arrests days later. See *Morris*, 340 Ga. App. at 300-301 (evidence of fellow gang member's actions days after predicate attempted armed robbery, aggravated assault, and aggravated battery that related to those offenses provided sufficient evidence

19

from which jury could infer intent to further gang's interest); see also *Alston v. State*, 329 Ga. App. 44, 47 (763 SE2d 504) (2014) (discussions among gang members about the predicate crimes after they were completed and defendant's protection of fellow gang members after the crimes was evidence showing intent to further gang's interests). This evidence was sufficient to satisfy the final element of a violation of OCGA § 16-15-4 (a), and, when viewed in the light most favorable to the verdict, the evidence was sufficient for a rational jury to find Boyd guilty beyond a reasonable doubt of the Gang Act violation of which he was convicted.

2. Boyd contends that the trial court erred when it denied a motion for directed verdict on Count 8, the violation of the Gang Act. The basis of Boyd's motion was that the State had failed to offer evidence that the alleged crimes were "furthering any gang activity." "A directed verdict of acquittal should be entered where there is no conflict in the evidence and the evidence demands a verdict of acquittal with all reasonable deductions and inferences." *Thompson v. State*, 302 Ga. 533, 536 (807 SE2d 899) (2017) (citing OCGA § 17-

20

9-1 (a)).  We have explained, however, that in reviewing a denial of a motion for directed verdict, "we apply the standard demanded by *Jackson v. Virginia*: Whether the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that [the defendant] was guilty of the crimes for which he was convicted."  *Thompson*, 302 Ga. at 536 (citing *Jackson v. Virginia*, 443 U. S. 307).  Thus, because we have already determined that the evidence was sufficient to support Boyd's Gang Act conviction, see Division 1 (b) above, Boyd's arguments about the trial court denying his directed verdict also fail.

3.  Boyd contends that the trial court erred by charging the jury on conspiracy over Boyd's objection because there was no evidence that Boyd and Harris had any discussions about committing the crimes.  We disagree.

If "slight evidence tends to show a conspiracy," then it is not error to charge the jury on conspiracy.  *Brown v. State*, 304 Ga. 435, 441 (819 SE2d 14) (2018).  A jury charge on conspiracy "can be supported by evidence of a common design as well as an express

21

agreement to commit a crime." Id. (citation and punctuation omitted). Where, as here,

> there is no evidence of an express agreement, an inference that two or more people tacitly came to a mutual understanding to commit a crime can be drawn from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances.

Id. (citation and punctuation omitted). We conclude that the evidence presented at trial and recounted above provided more than slight evidence tending to show the common design, agreement, or understanding necessary to warrant a conspiracy charge, and that the trial court did not abuse its discretion in giving that charge over Boyd's objection. See, e.g., *Brown*, 304 Ga. at 441; *Shepard v. State*, 300 Ga. 167, 170-171 (794 SE2d 121) (2016).

4. Boyd argues that the trial court erred by making an

22

improper comment on the evidence and on his guilt in the presence of the jury during Boyd's closing argument.  We disagree.

Former OCGA § 17-8-57, which was in effect during Boyd's trial in February 2015, provided: "It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. . . ."

To support his argument that the trial court violated former OCGA § 17-8-57, Boyd points to an exchange between his counsel and the trial court during closing argument.  Specifically, he notes that the trial court — with no prompting from the State — interrupted when counsel began explaining each indicted count to the jury.  Trial transcripts show that counsel said:

> If [the prosecutor] is correct, that parties to a crime means that anybody involved, like prosecutorial buck shot, it catches everybody in your path, anybody involved at all even if you didn't have knowledge and even if you didn't aid and abet. If that's true, then count malice murder would make sense, but it's not. And also even if it was true, I'm sorry, it would not make sense because if you think about this, malice has to be formed by the person doing it or somebody setting up a murder.  That's not

23

what happened even by the wildest stretch of imagination.

The trial court then interrupted, telling counsel he was "getting on kind of dangerous grounds" because there were "two theories in this case: conspiracy and parties to a crime," and the way counsel was arguing was "diminishing those theories legally where they can't be diminished that way." After a brief colloquy, the trial court warned counsel against trying to "explain the law to [the jury] that's contrary to what they are going to be given in the law."

Counsel proceeded with his closing argument and began talking about the felony murder counts in the indictment, saying "felony murder, while in the commission of an armed robbery . . . did cause the death of Ray Murphy . . . by shooting him with a pistol. Okay. You can count that off. [Boyd] didn't shoot a pistol." At that point, the trial court excused the jury and told counsel he was "simply misstating the law" and misleading the jury by implying that if Boyd did not pull the trigger then he could not be found guilty of the charged crimes. Counsel acknowledged that a defendant

24

"[t]heoretically" could be found guilty without pulling the trigger and told the trial court that he was working through the counts and would get to conspiracy and parties to a crime.

The trial court repeated that counsel could not instruct the jury on the law or mislead them about it, and told counsel not to "refer to the indictment in its literal sense" like counsel had done. The trial court also said that when the jury returned the court would explain that there were "two theories in this case, parties to the crime and conspiracy, that do not need to be included in the indictment."

When the jury returned and counsel continued his closing argument, he said, "[p]arties to a crime is a theory of prosecution that anyone who had knowledge and aided and abetted . . . ." The trial court interjected again, saying, "It's not a theory of prosecution. It's the law. He didn't make that up." Addressing the jury, the trial court continued:

> Parties to a crime is a legal concept. It's the law, and you'll be given the law by me at the conclusion of these arguments. What these attorneys say are not evidence and not to be considered by evidence to you. What they say about the law --- what I say about the law trumps

25

them. Is that clear to everybody?

Trial counsel completed his closing argument without further interruption or objection.

To violate former OCGA § 17-8-57, "the court's comment[s] had to pertain to a disputed issue of fact and express an opinion on whether that fact had or had not been proved at trial" or about guilt. *Brown v. State*, 302 Ga. 454, 463 (807 SE2d 369) (2017). In addition to arguing that the trial court inappropriately opined about what was proven at trial, Boyd makes the even more strained argument that the trial court expressed an opinion about Boyd's guilt by "basically instruct[ing] the jury that [Boyd] was part of a conspiracy or party to the crimes," which in turn "express[ed] its opinion that a fact at issue had been proven," which in turn implicitly "express[ed] its opinion as to the guilt of [Boyd]." We do not agree that, when viewed in the full context, the trial court commented on Boyd's guilt or innocence. See *Nalls v. State*, 304 Ga. 168, 174 (815 SE2d 38) (2018) (no violation of OCGA § 17-8-57 where "no reasonable jury would have understood the court's abstract statements about the

26

law as intimating that the judge believed that [the defendant] had shot [the victim]"). Viewing the trial court's comments in context and as a whole, the trial court's interjections were merely clarifying statements about the law that no reasonable jury would understand to be expressions or intimations of the court's opinion as to what facts had or had not been proved during trial or as to the guilt or innocence of the defendant. See, e.g., *Mitchell v. State*, 293 Ga. 1, 3-4 (742 SE2d 454) (2013) (trial court's comment — in sustaining State's objection to defense counsel's closing-argument statement that jury's verdict would be irreversible — that "[i]t's not necessarily irreversible . . . . That's an incorrect statement of the law" — did not violate statute because it "did not in any way intimate the judge's opinion on the evidence or appellant's guilt"); *Rowe v. State*, 266 Ga. 136, 138 (464 SE2d 811) (1996) (trial court's interruption of defense counsel in response to counsel's attempt to elicit improper testimony did not violate statute because the court "merely clarified the nature of the demonstration and enunciated a correct statement of the law" and did not express or intimate opinion about what had or had not

27

been proved or about guilt).  Because the trial court's statements were not error, Boyd's claim under former OCGA § 17-8-57 fails.

*Judgment affirmed.  All the Justices concur.*

Decided June 24, 2019.

Murder. Walton Superior Court. Before Judge Ott.

*Anthony S. Carter, Allison K. Parrish*, for appellant.

*Layla H. Zon, District Attorney, W. Cliff Howard, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Ashleigh D. Headrick, Assistant Attorneys General*, for appellee.