**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: January 5, 2026

S25A1098.  UPSHAW v. THE STATE.
S25A1099.  GLANTON v. THE STATE.
S25A1100.  UPSHAW v. THE STATE.

PINSON, Justice.

Terrence Upshaw, Roderick Glanton, and Homer Upshaw were each convicted of two counts of malice murder, two counts of aggravated assault, numerous violations of the Georgia Street Gang Terrorism and Prevention Act (the "Gang Act"), and other offenses related to a shooting that injured Wandray Harris and Ta'Journey Lee and resulted in the deaths of Saiveon Pugh and Jesse Ransom.[1]

---

[1] The shooting happened on June 14, 2021. Terrence, Glanton, and Homer were jointly indicted by a Muscogee County grand jury in October 2022 for six counts of violating the Gang Act (Counts 1–3, 5–7), two counts of malice murder (Counts 9–10), two counts of felony murder (Counts 11–12), four counts of aggravated assault (Counts 15–18), three counts of criminal damage to property in the first degree (Counts 19–21), and possession of a firearm during the commission of a felony (Count 22). Homer alone was indicted for two additional counts of violating the Gang Act (Counts 4, 8), two additional counts of felony murder (Counts 13–14), possession of a firearm by a convicted felon (Count 23),

On appeal, all three defendants contend that the trial court erred by admitting evidence of prior criminal offenses as evidence of criminal gang activity under OCGA § 24-4-418. In addition, Glanton and Homer contend that the evidence was not sufficient to support their convictions for malice murder and violations of the Gang Act. Glanton also contends that the State failed to disprove his justification defense and that the trial court erred by denying his motion for

_____

and trafficking marijuana (Count 24). After a joint jury trial from October 30 through November 14, 2023, the jury found each defendant guilty of all charges.

Terrence and Glanton were each sentenced to two concurrent sentences of life in prison for the two malice murders; concurrent sentences of 20 years in prison for each of two counts of aggravated assault, ten years in prison for each count of criminal damage to property in the first degree, and five years in prison for possession of a firearm during the commission of a felony; and 20 years in prison for each of the six Gang Act counts, which were to run concurrent to each other and consecutive to the other sentences. Homer was sentenced to two concurrent sentences of life without the possibility of parole for the malice murders; concurrent sentences of 20 years in prison for each of two counts of aggravated assault, ten years in prison for each count of criminal damage of property, five years in prison for possession of a firearm during the commission of a felony, ten years in prison for possession of a firearm by a convicted felon, and five years in prison for trafficking marijuana; and 20 years in prison for each of the eight Gang Act counts, which were to run concurrent to each other and consecutive to Homer's other sentences. For each defendant, the other two aggravated assaults merged with the murder convictions and the felony murder counts were vacated by operation of law.

The defendants timely filed motions for new trial, which were denied. Each defendant then timely filed a notice of appeal. Their appeals were docketed to the August 2025 term of court and submitted for decisions on the briefs.

new trial on the general grounds, see OCGA §§ 5-5-20 and 5-5-21. And Homer also contends that the trial court abused its discretion and impermissibly limited his right to cross-examination by excluding evidence of the victims' social media messages, and that the court abused its discretion by admitting a "meme" from the movie *Scarface* that was posted on Glanton's social media account. For the reasons that follow, each claim fails, and the defendants' convictions and sentences are affirmed.

1. *The Evidence Presented at Trial*

Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.

(a) *The Shooting*

Juanyae Baldwin was friends with the three defendants and lived in a duplex near the Wilson Apartments. In June 2021, Baldwin tried to buy a gun from Ransom through social media. Ransom

used the name "ZHG Jesse" on his social media account, and Baldwin testified that "ZHG" referred to the "Zohannon Gang."[2]

On June 12, 2021, Ransom drove to Baldwin's home in a silver car. Baldwin did not "have all the money" to buy Ransom's gun and offered to trade his Xbox 360 instead, but Ransom "didn't want it," "pulled a firearm on" Baldwin, and "sho[ ]t at" the home. Baldwin reported this shooting to the police but said that he did not tell any of the defendants about the incident.

Two days later, Ransom and three friends — Lee, Harris, and Pugh — went to the Wilson Apartments "looking for females," according to Harris, or for Ransom to meet "a female," according to Lee. Ransom drove the same silver car that he had driven to Baldwin's home two days earlier.[3] Lee rode in the front passenger seat and had a handgun in his lap or waistband. Pugh and Harris rode in the backseat with a rifle lying between them. Everyone in the car

---

[2] One of the State's gang experts confirmed that "ZHG" referred to the Zohannon gang and that Ransom was associated with that gang.

[3] Baldwin was shown a photo of the car driven by Ransom on the night he was killed and testified that it was the same car he had seen Ransom drive on June 12.

wore "ski masks" because it was "around the time COVID popped up."[4] Harris testified that they did not plan to use the guns and no one in the car fired a gun that night. But one of the State's gang experts testified that surveillance footage of the area showed what appeared to be the barrel of a rifle facing toward the outside of the victims' car as they drove around.

Lee had never been to the Wilson Apartments before, and Ransom drove around "searching for the place." Harris described the area as "a maze" and said it was easy to "get lost over there." Indeed, Ransom "rode down, turned around," said "it wasn't the right place," and drove "[b]ack up the street." After that, Lee and Harris heard gunshots. Surveillance video admitted into evidence showed that after the car drove by, a group of men with guns came out of a home on 7th Avenue, waited in the yard, and when the victims drove by

---

[4] Sergeant Kyle Tuggle testified that driving down the street wearing masks, including ski masks like Ransom's, had become a "fad or a trend between teenagers since COVID," although surgical-style masks like the one found in the victims' car were "more common." All four victims were in their late teens: Lee was 19 years old at the time of trial in 2023; Harris was 21 at the time of trial and had been 18, "[t]urning 19," in 2021; Ransom was 17 years old when he died; and Pugh was 18 years old when he died.

again, the men then opened fire on the car.

After the shots were fired, the car crashed. Lee passed out and, when he woke up, he realized he had been shot and called 911. Lee was taken to the hospital by ambulance. He stayed there "[m]ore than one day" and was treated for a gunshot wound to his back. He testified that he did not know the people who shot him and that neither he nor anyone else in the car had fired their guns. Harris was shot three times in the back. Harris said he went "in and out of" consciousness and then was taken to the hospital by ambulance. He "couldn't move" and was hospitalized for three weeks. The other two died: Ransom from gunshot wounds to his torso and lower extremities, and Pugh from gunshot wounds to his head, upper extremities, and lower extremities.

Baldwin testified that he was at home on June 14 and heard gunshots. He then called to check on Homer "two or three minutes later." Homer answered the phone; Baldwin asked, "what's going on, y'all good over there"; and Homer said "yeah, we straight" and hung up.

6

(b) *The Investigation*

On the morning after the shooting, Sergeant Kyle Tuggle learned about the surveillance footage that showed the shooting and reviewed it. The police got a search warrant for the home that the shooters had come out of. Surveillance footage of the same home from earlier in the day showed different people driving up to and going in and out of the home throughout the day, which was a "pattern of behavior that would be consistent with the sale of drugs." Sergeant Tuggle also noticed foot traffic between the 7th Avenue home and the one across from it on 32nd Street, so he obtained a search warrant for that home, too.

During the search of the home on 7th Avenue, fingerprints were collected as well as a magazine for a rifle and some ammunition. The ammunition was of the same brand and caliber as some of the cartridge casings collected at the crime scene. It was later determined that this address was associated with Terrence and had been the subject of an earlier investigation into gang activity in the area.

About a week-and-a-half after the shooting, investigators also

searched the home on 32nd Street. There, investigators found a handgun, ammunition, and a power bill addressed to Terrence for the 7th Avenue home. They also found mail addressed to Terrence at the 7th Avenue home, a gun magazine, cell phones, and a digital scale "that's commonly used with the association of drugs," "items used in the packaging of drugs," an "ashtray with blunts," and "packaging for blunts." And they found a backpack with drugs inside, which indicated to Sergeant Tuggle that the home on 32nd Street was being used to package and sell drugs. In total, investigators found about five pounds of marijuana inside the home.

Once Terrence was identified as a suspect, investigators got search warrants for his social media accounts. Investigators also identified Terrence's brother, Homer, as a potential suspect and began investigating him. The surveillance footage from the night of the shooting showed a woman getting into a car and driving away right before shots were fired. Investigators identified that woman as Alyssa Dunbar and learned that she shared a child with Homer.

Dunbar testified that she and Homer lived together with their

8

child in June 2021. Their child had recently turned one, and Dunbar, Homer, and the child went to the Wilson Apartments to visit Terrence, who had a gift for the child, and Glanton was there too. Terrence gave the child some "birthday money" and they took photos together. Dunbar and the child stayed for about ten minutes, and while there, Dunbar noticed a car "riding back and forth." The same car drove by again while they were outside. She saw two people in the front seats of the car, both of whom wore masks, which scared her. She saw the car turn and Homer told her to "hurry up and get in [her] car" with their child. It looked to her like a drive-by shooting was about to occur, like in the "movies." She got the child into the car and drove to her grandmother's home, which was less than five minutes away. Homer stayed behind. She heard gunshots when she was driving away.

After Dunbar was interviewed, Sergeant Tuggle continued to investigate Terrence and Homer, obtaining search warrants for additional social media accounts and cell phone records. He also started to investigate Glanton as a possible suspect. In one social

media photo, Glanton was wearing the "exact same clothing" as one of the shooters shown in the surveillance video. Eventually, Sergeant Tuggle was able to identify Terrence, Homer, and Glanton as three of the four shooters seen in the surveillance footage. The surveillance footage from earlier in the day showed Glanton, Terrence, and Homer walking back-and-forth between the homes on 7th Avenue and 32nd Street from about 6 to 9:30 on the night of the shooting. From the footage of Homer and Dunbar arriving at the home later that night, Sergeant Tuggle saw that Homer was carrying a rifle. The fourth shooter seen in the surveillance footage had not been identified at the time of trial.

Sergeant Tuggle also identified phone numbers for each defendant and then got search warrants for their phone records. Cell phone records placed each of their phones in the area of the Wilson Apartments at the time of the shooting.

On July 19, 2021, arrest warrants were issued for Homer, Terrence, and Glanton. A week later, Terrence was arrested at the local mall, and Homer was arrested at his home on the same day. A search

10

warrant was obtained for Homer's home, which was then searched. Investigator found a total of 15.4 pounds of marijuana "in different locations" in the home. Investigators also found a digital scale associated with drug activity. Glanton was arrested several months later, on October 8.

(c) *Firearms Evidence*

At trial, Corporal Adam Breeden testified that he had processed the car that Harris, Ransom, Pugh, and Lee were in when they were shot. He saw "significant bullet defects through the driver's side and around the rear" of the car and a "significant amount of suspected dry blood" inside. The "bullet defects" were "consistent with incoming shots." A spent cartridge casing was found inside the car but was not matched to any of the guns in the victims' car that night.[5] But Corporal Breeden testified that this did "[n]ot necessarily" mean that someone fired a gun inside the car, because

---

[5] The firearms expert testified that the nine-millimeter spent shell casing in the victims' car was consistent with nine-millimeter casings from a "separate incident" but did not match any of the nine-millimeter handguns provided for testing.

11

someone could have picked up the spent casing and put it in the car. But Corporal Breeden did not know how this casing came to be in the car.

Catherine Jordan, a GBI firearm and tool mark examiner, testified as an expert in firearm examination and identification. She examined firearms, bullets, and cartridge casings related to the investigation. None of the cartridge casings collected at the crime scene were consistent with being fired from the victims' guns, including the spent cartridge case found in the victims' car. However, Jordan testified that all but one of the nine-millimeter cartridge cases themselves shared "class characteristics," which indicated that they had been fired from the same gun (but not any of the victims' guns); all 27 of the 7.62x39-millimeter cartridge cases collected at the scene were consistent with being fired from one gun; and all 24 .223/5.56x45-millimeter rifle cartridge cases collected at the scene were fired from a single gun. Bullets and bullet fragments collected from the autopsies were 7.62x39-millimeter bullets or fragments. And the bullets collected from the two autopsies shared class

and individual characteristics that indicated they were fired from the same gun.

## 2. *Sufficiency of the Evidence*

Glanton and Homer each claim that the evidence was not sufficient to support certain of their convictions. We assess whether evidence was sufficient as a matter of federal due process by viewing the evidence in the light most favorable to the verdicts and asking if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Mills v. State*, 320 Ga. 457, 461 (2024) (quoting *Jackson v. Virginia*, 443 US 307, 319 (1979)) (emphasis in original)). In applying this standard, "we do not weigh the evidence on appeal or resolve conflicts in trial testimony but instead defer to the jury's assessment of the weight and credibility of the evidence." *Chambliss v. State*, 318 Ga. 161, 163 (2023) (cleaned up).

### (a) *Malice Murder*

Glanton and Homer claim that the evidence was not sufficient to support their convictions for malice murder. To find a defendant

guilty of malice murder, the jury must find that the defendant acted with "malice, which incorporates the intent to kill." *Scoggins v. State*, 317 Ga. 832, 836 (2023); OCGA § 16-5-1(a). The evidence here showed that Glanton and Homer (as well as Terrence, who does not raise this issue on appeal) came outside and fired at the victims' car multiple times as it drove by, causing the car to crash, killing the car's driver (Ransom) and one passenger (Pugh), and wounding the two other passengers (Harris and Lee). This evidence authorized the jury to conclude the defendants shot into the victims' car with the intent to kill them. Id.

The evidence was also sufficient for the jury to reject the defendants' justification defense. To justify the use of deadly force, the person claiming the justification defense must have "reasonably believe[d] that such force [was] necessary to prevent death or great bodily injury to himself" or to others. OCGA § 16-3-21(a). Here, a jury likely could have made such a finding about the defendants based on evidence that the victims drove by them wearing ski masks

and had guns in the car: a jury might have inferred that the defendants saw masked men drive by with guns pointed at them and reasonably believed that they were about to be shot. But a jury is also "free to reject any evidence in support of a justification defense and to accept the evidence that the defendant did not act in self-defense," *Allen v. State*, 322 Ga. 417, 422–23 (2025), and the evidence here authorized a jury to do just that. Although one of the State's gang experts testified that he saw a rifle with its barrel pointed toward the car's window in the surveillance video, and it is undisputed that the victims were armed, neither the surveillance video nor an eyewitness indicated that the men in the car directed any conduct towards the defendants, other than driving past their home more than once. The surviving victims claimed that they were lost and turned around, which the jury was free to credit as the reason the victims — who said they did not know the defendants — drove by the defendants' home multiple times. And the evidence amply supported a finding that none of the victims fired their guns: although one cartridge casing was found in the car, neither this casing nor any other

ballistic evidence collected from the crime scene matched the victims' guns, and the bullet holes in their car were all consistent with shots fired into the car. Finally, the evidence showed that the defendants were inside their home when the victims first drove by, then came outside with guns, waited in the yard, and as soon as the victims' car drove by again, fired more than 50 rounds towards the car — conduct the jury was authorized to conclude was not reasonably necessary to defend against any threat posed by the victims. Given this evidence, the jury was authorized to find either that the defendants did not reasonably believe they were in danger of being shot or that the defendants' conduct was not reasonably necessary to defend against any such threat from the car's occupants, and thus reject their justification defense.[6] See id.

---

[6] Toward the end of his sufficiency argument in his brief, Homer also suggests that the evidence supported a conviction for voluntary manslaughter instead of murder. But Homer did not request an instruction on voluntary manslaughter at trial (and neither did his co-defendants); he did not object to the jury charge as given, which did not include an instruction on voluntary manslaughter; and he does not argue on appeal that the trial court erred by not instructing the jury on voluntary manslaughter. To the extent that this mention of voluntary manslaughter might be construed as an argument that the evidence was not sufficient to show the intent required for malice murder

16

(b) *Gang Act Violations*

Glanton and Homer also claim that the evidence was not sufficient to support their convictions under the Gang Act that were predicated on the murders of Ransom and Pugh, the aggravated assaults of Lee and Harris, trafficking of marijuana, and criminal damage to property.[7] To establish that a defendant violated the Gang Act, the State must prove beyond a reasonable doubt (1) the existence of a "criminal street gang," (2) that the defendant was "employed by or associated with" the gang, (3) that the defendant committed one of the offenses listed in OCGA § 16-15-3(1) as "criminal gang activity," and (4) "that the crime was intended to further the interests of the gang," which is sometimes described as the "nexus" element. *Boyd v. State*, 306 Ga. 204, 209 (2019) (citing *McGruder v.*

---

because the evidence instead showed that Homer shot the victims as the result of "sudden, violent, and irresistible passion," OCGA § 16-5-2(a), such an argument fails. For the reasons discussed above, the evidence was sufficient to authorize the jury to conclude that Homer shot the victims intentionally and to find him guilty of malice murder. See *Scoggins*, 317 Ga. at 836; OCGA § 16-5-1(a).

[7] The charges based on criminal damage to property were supported by testimony from the defendants' neighbors, who said their homes or cars were damaged by stray bullets during the shooting. See OCGA § 16-7-22. None of the defendants challenge this specific predicate.

17

*State*, 303 Ga. 588, 591–92 (2018) (citing OCGA § 16-15-4)). The existence of a criminal street gang may be supported by "evidence that multiple gang members conspired to engage in underlying ... 'criminal gang activity' as defined in OCGA § 16-15-3(1), (2)." Id. (emphasis omitted). The definition of "criminal gang activity" is broad: it includes the "'commission, attempted commission, [or] conspiracy to commit …. [a]ny offense defined as racketeering activity by Code Section 16-4-3,'" which in turn "includes violations of the Georgia Controlled Substances Act, see OCGA § 16-14-3(5)(A)(xxxiv), as well as '[a]ny criminal offense … that involves violence, possession of a weapon, or use of a weapon.'" Id. (quoting OCGA § 16-15-3(1)(A) and (J)). Whether a crime that fits this definition was done to further the gang's interests is a question of intent and "may be inferred from conduct before, during and after the commission of the crime." *Boyd*, 306 Ga. at 210 (internal quotation marks omitted).

(i) *Gang-Related Evidence*

In addition to the evidence recounted above, the State pre-

sented testimony from two witnesses who were qualified as gang experts.

Lieutenant Jeremey Hattaway testified that he had been in law enforcement for almost 27 years and started as a patrol officer in the area around the Wilson Apartments. Early in his career, the gangs in the area included the Wilside Boys, who were associated with the Wilson Apartments. Then a gang called the Taliban 5150 became active in the area. The Taliban 5150 gang "dissipated," and "kind of evolved into Lime Green Money Gang," which "then kind of evolved into Marlo Gang." The Marlo Gang started "recently," around 2021.

In multiple photos admitted into evidence, Homer is shown displaying an "M" hand signal, which Lieutenant Hattaway testified was "common to what the Marlo Gang is using now." There were also photos of Terrence and Glanton making "M" hand signs. Lieutenant Hattaway identified Homer in another photo where he is holding two guns, which Lieutenant Hattaway described as a 7.62-millimeter mini-Draco firearm and a 5.56-caliber AR-style pistol.

19

Additional photos from social media showed Glanton with cash and firearms. Lieutenant Hattaway also identified social media messages where Glanton and Terrence discussed selling guns and drugs. In Lieutenant Hattaway's opinion, Homer, Terrence, and Glanton were all active members of the Marlo Gang.

Lieutenant Hattaway testified that photos like these — showing gang members with guns and money — are often posted to social media to "show any opposition forces, this is what I'm working with if you try to come mess with me." And he testified that when someone "treads into" or "infringes on" a gang's territory, "it's a sign of disrespect" that the gang must "respond[ ] to immediately" because otherwise the gang will "be looked upon as being weaker" and "los[e] some of their influence within the community."

Lieutenant Hattaway also testified that Zohannon was one of the "larger local hybrid gangs" in Columbus, with 278 identified

members. Lieutenant Hattaway knew Lee, Harris, Pugh, and Ransom to be members of Zohannon.[8] The Marlo Gang and Zohannon were rivals.

William Murdock, an investigator with the Gang Prosecution Unit of the Georgia Attorney General's Office, testified that "nontraditional hybrid" or "neighborhood based" gangs (he used the two terms interchangeably) are a "group that's generally centered around a specific area of territory." Most "form around a neighborhood or a specific area" where the gang wants to "commit their crimes or control through fear." This territory can also be referred to as the gang's "stronghold" and is "an area that [the gang] dominate[s]" through displays of violence.

(c) *Analysis*

This evidence was sufficient to support jury findings that the Marlo Gang was a criminal street gang, that Glanton and Homer were members, and that they engaged in criminal gang activity. See

---

[8] Lee admitted that he was part of the Zohannon "family" but denied that it was a gang. Harris said he was not a member and Lee said that he did not know whether Pugh or Ransom had been members.

*Boyd*, 306 Ga. at 209–10. As to the existence of the gang, the State's gang expert testified that the Marlo Gang had been established in 2021 and "evolved" from two other gangs, Taliban 5150 and Lime Green Money Gang. Although the State's expert had not identified any flags or colors common to the Marlo Gang, he testified that they used common hand signs and emojis on social media. As for association with that gang, there was evidence that Homer had been a member of the Taliban 5150 Gang in 2016, one of the gangs that had "evolved" into the Marlo Gang by 2021, and that Homer and Glanton (as well as Terrence)[9] had displayed the Marlo Gang's "M" hand signs in photos posted to social media. And there was evidence that Homer, Glanton, and Terrence were selling drugs and involved in the shooting of Ransom, Pugh, Lee, and Harris — conduct that falls within the definition of criminal gang activity. See OCGA § 16-15-

---

[9] Terrence does not argue on appeal that the evidence was not sufficient to support his convictions. However, a criminal street gang is defined, in part, as having "three or more persons," see OCGA § 16-15-3(3), so evidence of Terrence's membership in the gang and participation in criminal gang activity is relevant to the analysis of Homer and Glanton's argument that the State did not prove the Gang Act violations beyond a reasonable doubt.

3(a)(A), (J). See also *Boyd*, 306 Ga. at 209.

Finally, the evidence was sufficient to support a jury finding that the shooting was intended to further the interest of the defendants' gang. Both gang experts testified that gangs are territorial and use violence to control the area where they commit their crimes. And Lieutenant Hattaway testified that gang members must immediately respond to any intrusion on their territory or risk weakening the gang's reputation in the community. And there was evidence from which the jury could have concluded that the Marlo Gang operated its drug operation in the area of the Wilson Apartments — and indeed, in the immediate area of the home on 7th Avenue, where the defendants emerged and opened fire towards the victims' car when they drove by. Viewed in the light most favorable to the verdicts, the jury was authorized to conclude that the defendants saw the victims driving around the Wilson neighborhood wearing masks and carrying guns as disrespectful to the gang, and the defendants came outside and fired at the victims' car with the intent to protect the gang's territory and maintain its control of the area and their

23

reputation in the community, so the evidence of Gang Act violations was sufficient. See *Stripling v. State*, 304 Ga. 131, 134 (2018) (evidence that victim had tried to infringe on the area where the defendants' gang operated its drug business was sufficient to establish a nexus between the crimes and the gang).

### 3. *The General Grounds*

Glanton claims that the trial court erred by failing to grant a new trial under OCGA § 5-5-20 and 5-5-21, commonly referred to as the "general grounds." The trial court has the sole discretion to grant a new trial on the general grounds, so on appeal, we may assess only "whether the trial court exercised that discretion." *Whisnant v. State*, 322 Ga. 253, 259 (2025). In its order denying Glanton's motion for new trial, the trial court explained that it had reviewed the record, reweighed the evidence, and reconsidered the credibility of witnesses, and then concluded that a new trial was not warranted based on the general grounds. There is no evidence that the trial court did not exercise its discretion in this regard, so this claim fails. See id.

### 4. *Evidence Admitted Under Rule 418*

All three defendants claim that the trial court abused its discretion by admitting their prior drug offenses as criminal gang activity under Rule 418.

Under our Evidence Code, if a criminal defendant is accused of criminal gang activity, see OCGA § 16-15-4, evidence of his "commission of criminal gang activity, as such term is defined in Code Section 16-15-3, shall be admissible and may be considered for its bearing on any matter to which it is relevant." OCGA § 24-4-418(a) (Rule 418). The standard for relevance is "liberal," and "relevant evidence is admissible even if it has only slight probative value." *Wilson v. State*, 315 Ga. 728, 738 (2023) (cleaned up). See also OCGA § 24-4-401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Finally, relevant evidence introduced under Rule 418 is also subject to OCGA § 24-4-403 (Rule 403). See *McKinney v. State*, 318 Ga. 566, 571–72 (2024). Under that rule,

relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. "Inculpatory evidence is inherently prejudicial" but it is only *unfairly* prejudicial "if the evidence has the capacity to lure the factfinder into declaring guilt on a ground different from the proof specific to the offense charged or an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Wilson*, 315 Ga. at 738–39 (cleaned up).

(a) *Evidence of Prior Criminal Gang Activity*

The State presented the following evidence of criminal gang activity under OCGA § 24-4-418 and over the objections of the defendants, after the trial court gave a limiting instruction.

(i) *Homer Upshaw*

Detective Ryan Vardman of the Columbus Police Department encountered Homer in March 2016 when Detective Vardman and another officer saw a car driving on the wrong side of the road and initiated a traffic stop. The car "abruptly turned into a drive and drove behind a house" and the front seat passenger left the car and

26

"fled on foot." While the other officer chased the passenger on foot, Detective Vardman approached the car and spoke to the driver, who was Homer. Detective Vardman smelled a "strong odor of marijuana," then searched the car and found "a small amount of marijuana" as well as a "stolen Smith and Wesson nine millimeter firearm." This was about "three blocks from" the Wilson Apartments. At the time, Homer was a "documented member of a hybrid street gang called Taliban 5150." Baldwin was a passenger in the car and was a known member of the same gang. The Marlo Gang was not active in 2016, and Detective Vardman could not say whether Taliban 5150 became the Marlo Gang, but he knew of people who were members of both gangs.

Sergeant Robert Miller of the Muscogee County Sheriff's Office encountered Homer on February 12, 2017, when officers were looking for someone and saw Homer "jimmying with a door lock to a car." After shining a spotlight on Homer, Homer ran away, and Sergeant Miller chased him on foot "through the Wilson Apartments and

down several streets." Homer had a stolen Browning nine-millimeter pistol on his person, and he was eventually taken into custody. Homer was a known member of Taliban 5150 at the time. Some members of Taliban 5150 are now members of the Marlo Gang, but Sergeant Miller was not aware of the Marlo Gang in 2017.

Investigator Jacob Cook worked for the Columbus Police Department in 2019 and encountered Homer during a traffic stop. Homer had been driving with his high beams on "not far" from the Wilson Apartments. When Investigator Cook approached the car, he could smell marijuana and saw a beer can in the center console. Officers found marijuana and a gun in the car.

The parties stipulated that Homer was a convicted felon and had been convicted of theft by receiving stolen property.

(ii) *Terrence Upshaw*

Lieutenant David Batastini of the Muscogee County Sheriff's Office encountered Terrence in December 2020 when Lieutenant Batastini was looking for someone else, knocked on the door of an apartment, and Terrence opened the door. Terrence said he was

alone in the apartment but, while speaking with Terrence, officers saw the person they were looking for walk through the apartment. Another person in the apartment tried to throw a stolen Taurus nine-millimeter pistol out of a window but was stopped by the police. Police also found "several amounts of different kinds of narcotics inside the apartment in plain view" and then obtained and executed a search warrant for narcotics. This apartment was within walking distance of the Wilson Apartments. Charges related to the narcotics were pending against Terrence and the other men at the apartment at the time of trial.

(iii) *Glanton*

Officer Travis Contreras of the Columbus police department encountered Glanton in November 2017 near the Wilson Apartments. Glanton was a passenger in a car that Officer Contreras stopped for a traffic violation. When Officer Contreras and another officer approached the car, the other officer "saw a bag of ecstasy sitting right between the driver and the passenger." Glanton was inside the car and had an AK-47 next to him and a pistol on his hip.

Glanton also had a bookbag at his feet that contained about 150 grams of marijuana. Officer Contreras did not recall any evidence that Glanton was in a gang at the time.

Corporal Alonso Trevizo of the Columbus Police Department encountered Glanton in August 2020 when he saw a speeding car and conducted a traffic stop. Glanton was a passenger in the car, and Corporal Trevizo smelled marijuana when he approached the car and then searched it. Glanton had a "clear plastic bag containing a green leafy substance" in his pocket and attempted to flee on foot. He was arrested "after a short foot pursuit." Officers also found a stolen nine-millimeter Glock 17 pistol on the floorboard of the passenger side where Glanton had been sitting.

(b) *Rule 418 Analysis*

Applying the above standards here, the trial court did not abuse its discretion in admitting evidence of these defendants' prior drug crimes. The State introduced that evidence under Rule 418 as evidence that they engaged in "criminal gang activity" within the

meaning of OCGA § 16-15-3. As discussed above, "criminal gang activity" is a broad category that includes the prior drug crimes at issue here. See OCGA §§ 16-15-3(1)(A), 16-14-3(5)(A)(xxxiv), 16-13-21(4); 21 CFR § 1308.11(d)(23) (marijuana).[10] See also *Boyd*, 306 Ga. at 209. When such offenses are introduced under Rule 418, there is no requirement that the prior offenses have a connection to "gang association or furthering the interest of a gang." *McKinney*, 318 Ga. at 570, 572. So the prior drug crimes qualify as evidence of the defendants' "commission of criminal gang activity." OCGA § 24-4-418 (a). And because one of the issues in this case was the defendants' involvement in the drug trade, evidence of which was offered by the State to prove some of the Gang Act violations, evidence of their prior drug crimes met the low bar for relevance. See *Wilson*, 315 Ga. at 738. Finally, the trial court acted within its discretion in concluding that the probative value of this evidence was not substantially

---

[10] Georgia's definition of a "Controlled Substance" incorporates the federal Schedules of Controlled Substances. See OCGA § 16-13-21(4).

outweighed by unfair prejudice. The prior drug activity was probative of the defendants' involvement in criminal gang activity, an element that the State had to prove for the Gang Act violations. See *Boyd*, 306 Ga. at 209. And in addition to this Rule 418 evidence, the jury heard that the defendants were involved in the large-scale sale of marijuana at the time of the shooting. So the Rule 418 evidence that the defendants had committed relatively minor drug crimes in the past, some while associated with a gang and others not, may have been "unflattering," but it was not the type of evidence "that could inflame the passion of the jury for a reason that is irrelevant to the guilt or innocence of the defendant." See *Wilson*, 315 Ga. at 739. In short, the evidence of the defendants' prior crimes was relevant and, although "inherently prejudicial," was not unfairly so. See id. at 738.

5. *Other Evidentiary Rulings*

Homer claims that the trial court committed two more evidentiary errors. We address each of these claims in turn.

(a) *Exclusion of Victims' Social Media Messages*

Homer claims that the trial court abused its discretion and impermissibly limited his cross-examination of Sergeant Tuggle by excluding social media messages between the deceased victims, Ransom and Pugh. His counsel proffered that in those messages, which were sent on May 19, 2021, Ransom and Pugh were "talking about trying to pull up and shoot a Quadarrius Cruise (phonetic) who is visiting over in the Wilson area, associated with the Wilson area, saying anytime we see him, we're going to shoot him."

Earlier in the trial, Harris testified that Cruise was his mother's boyfriend and had "pistol-whipped" Pugh. Cruise lived in the area around the Wilson Apartments, but Harris knew "for sure" that Cruise was not at home on the night of the shooting because Harris had spoken to his mother and he knew before driving to the area that Cruise was at a hotel that night.

And Sergeant Tuggle testified on cross-examination that he had learned of an incident between Cruise and Pugh during his investigation but that he had not uncovered any evidence that Homer

33

knew about the situation between Cruise and Pugh. When defense counsel later sought during Sergeant Tuggle's testimony to introduce the social media messages between Ransom and Pugh, which referenced looking for and shooting Cruise, the State objected to the messages as hearsay. Defense counsel responded that the messages were excepted from the rule against hearsay as statements against interest.[11] The trial court concluded that the messages did not qualify as statements against interest because of their lack of trustworthiness, see OCGA § 24-8-804(b)(3)(B), and the evidence was excluded.

---

[11] See OCGA § 24-8-804(b)(3). This exception applies only when the witness is unavailable, and a statement against interest is defined as:
a statement:
(A) Which a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate a claim by the declarant against another or to expose the declarant to civil or criminal liability; and
(B) Supported by corroborating circumstances that clearly indicate the trustworthiness of the statement if it is offered in a criminal case as a statement that tends to expose the declarant to criminal liability[.]

(i) *The Hearsay Ruling*

Even assuming that the trial court abused its discretion by sustaining the State's hearsay objection and excluding the deceased victims' social media messages under Rule 804(b)(3), that error was harmless. A non-constitutional evidentiary error is harmless if it is "highly probable that the error did not contribute to the verdict." *Moss v. State*, __ Ga. __, S25A0650, slip. op at 5 (Oct. 15, 2025) (quoting *Smith v. State*, 313 Ga. 584, 587 (2022)). Homer contends that the social media messages would have supported his justification defense, but it is hard to see how. At bottom, that defense turned on whether Homer reasonably believed he was about to be shot by the victims driving by. As discussed above, the jury could have reached that conclusion through an inference, based on admitted evidence, that the defendants saw masked men drive by with guns pointed at them. Such an inference would not be strengthened in any significant way by evidence that the masked men might have had a subjective intent to locate and shoot a different person, particularly

given evidence that the person in question was not with the defendants or even in the area of the Wilson apartments at the time, and no evidence that Homer knew about the victims' intent. Put another way, we do not see how a potential explanation for why the victims drove by with masks and guns would have materially affected the jury's assessment of whether Homer reasonably believed they were about to shoot him or the people with him. Thus, it is highly probable that excluding this evidence under Rule 804(b)(3) did not contribute to the verdicts, and so any error in excluding this evidence was harmless. See *Moss*, __ Ga. at __, S25A0650, slip. op at 5.

(ii) *The Alleged Confrontation Clause Violation*

Homer also makes a brief argument that excluding this evidence violated the Confrontation Clause of the Sixth Amendment to the United States Constitution by impermissibly limiting his cross-examination of Sergeant Tuggle. But Homer raises this Confrontation Clause argument for the first time on appeal, so we review it for plain error. See *Burke v. State*, 320 Ga. 706, 706 (2025). To establish plain error, a defendant must establish, among other things, that

the error "affected his substantial rights, meaning that it affected the outcome of the trial court proceedings." *Pugh v. State*, 318 Ga. 706, 717 (2024) (cleaned up). And for the same reasons that any error in excluding this evidence under Rule 804(b)(3) was harmless, any limitation its exclusion placed on Homer's cross-examination of Sergeant Tuggle in potential violation of the Confrontation Clause was not likely to have affected the outcome of the trial. So Homer has not established plain error. Id.

(b) *Admission of the Scarface "Meme"*

Homer claims that the trial court abused its discretion by admitting a "meme" from the movie *Scarface* that Glanton had posted on social media because it was both irrelevant and unfairly prejudicial. The trial court admitted the meme over Homer's objection, and it was published to the jury as one of a "series of photos" obtained from Glanton's social media.

Sergeant Tuggle testified that the *Scarface* meme was a "re-post" that Glanton had "shar[ed]" on July 5, 2021 and was captioned, "Real gangsters got morals, 100. It's real as it gets. Sacrifice. [sic]

37

Kids off limits." This photo was not mentioned again until Glanton's cross-examination of Sergeant Tuggle, when counsel asked whether the photo was a reference to the movie *Scarface*, and Sergeant Tuggle answered that the caption actually said, "*Scarface*, kids off limits" (as opposed to "sacrifice," as he had said on direct). Sergeant Tuggle also reaffirmed that this was a post that was shared, not made, by Glanton.

Even assuming that the trial court erred by admitting the meme over objection, the error was harmless. See *Moss*, __ Ga. at __, S25A0650, slip op. at 5. The evidence that Homer shot the victims intentionally and without provocation was substantial, as was the evidence that he and his co-defendants were gang members involved in the large-scale sale of marijuana. Given this evidence, it is highly probable that a single meme referencing *Scarface* did not influence the jury's guilty verdicts. So any error in admitting the meme was harmless.[12]

_____

[12] Homer does not claim that the cumulative effect of the assumed evidentiary errors requires a new trial, nor do we see any merit to such a claim. See, e.g., *Williams v. State*, 318 Ga. 83, 97 (2024).

*Judgment affirmed. All the Justices concur.*